**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

KAPITUS SERVICING, INC.,

      Plaintiff,                              Case No. 3:26-cv-00315

v.

MARQUE DENTAL LABORATORY, LLC
and MICHAEL LUKES,

      Defendants.

_____/

## <u>MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW</u>

Come now Marque Dental Laboratory, LLC ("Marque") and Michael Lukes ("Mr. Lukes") (collectively, the "Defendants," and each a "Defendant"), by and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 12, and move to dismiss the above-captioned suit on account of the failure of Kapitus Servicing, Inc. ("Kapitus" or the "Plaintiff") to state a claim for which relief may be granted, and in support thereof state as follows:

### I.      Introduction

This case concerns a merchant cash advance ("MCA") contract—a form of agreement that has become both more commonplace and more scrutinized over recent years—and the efforts of Kapitus to assert a breach thereof. MCA agreements offer to infuse cash, typically into small businesses, and do so upon the insistence such infusion is not a loan but, rather, a sale of inchoate future receivables. The distinction is critical to the MCA industry because the repayment terms of such agreements would otherwise offend the commercial usury laws of myriad states. Yet MCA contracts are not traditional factoring agreements where extant receivables are sold; MCA

1

contracts, rather, command the payment of a percentage of *all* future receivables until such a time as an obligation is satisfied.

In this case, Kapitus alleges that it entered into an MCA agreement with Marque— guaranteed by Mr. Lukes—through which Kapitus would pay Marque the sum of $28,392.00 in exchange for Marque giving Kapitus the sum of $178,100.00 in future receivables at established weekly increments equal to 16.4% of Marque's revenues (with that 16.4% share projected to be $2,571.00 per week). Had this transaction been a loan, the effective interest rate would have been 395.81%. Yet, since the agreement is couched as a sale of receivables, the interest rate is putatively immaterial (which, while of less import under Virginia law, is of enormous import in other states where Kapitus operates and where commercial usury laws are extant).

Critical to this construct is a shifting of risk. A loan is payable (in most circumstances) without regard to a business' financial fluctuations. A sale of receivables, however, is only collectible to the extent a business continues to have receivables. And that distinction ultimately informs the pleading deficiency at the heart of the complaint (the "Complaint") filed by Kapitus.

Though nowhere alleged in the Complaint, Marque ceased conducting business in early 2025. The absence of this allegation from the Complaint speaks to the pleading problem instantly before this Honorable Court: to state a claim for failure to perform under a contract pegged to a sale of future receivables, the Plaintiff needs to allege that there continued to be receivables. The Plaintiff has not made—and cannot make—that allegation.

Instead, the Complaint is demonstrative of the tension that seemingly underlies the emerging MCA industry: Kapitus has sheltered itself from the obligations attendant to being a lender, by insisting monies are not being loaned and are simply being used to purchase future

receivables, yet Kapitus has taken to endeavoring to collect on the resultant contractual obligation as though the underlying transaction is a loan. This is not a legally tenable posture.

For this reason, and as extrapolated upon *infra*, it is respectfully urged this suit be dismissed.

## II.      Standard

The Federal Rules of Civil Procedure permit a party to seek dismissal for, *inter alia*, a pleading's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To survive such a motion to dismiss, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009), as exemplified by "enough facts to state a claim to relief that is plausible on its face" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In assessing a complaint's allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555. *See also Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013) ("It is now well established that mere conclusory and speculative allegations are not sufficient to withstand a motion to dismiss.").

Moreover, where—as here—one or more documents are appended to a pleading, those documents may be considered in connection with a motion to dismiss. *See, e.g.*, *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016) ("While a 12(b)(6) motion focuses on the allegations of the complaint, it is well established that a document attached to a motion to dismiss may be considered when evaluating a motion to dismiss if the document was 'integral to the complaint and authentic.'") (quoting *Sec'y of State For Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). And where there is a tension between the allegations of a pleading and

the text of the document(s) appended thereto, it is the exhibit that ultimately controls for purposes of assessing a motion to dismiss. *See, e.g.*, *Moorehead v. Keller*, 845 F. Supp. 2d 689, 693 n.1 (W.D.N.C. 2012) ("When a document attached to the pleadings contradicts the allegations of the complaint, the document controls in a Rule 12(b)(6) motion to dismiss.") (citing *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). *See also Cohen v. Capital One Funding, LLC*, 489 F. Supp. 3d 33, 46 (E.D.N.Y. 2020) ("If a plaintiff's allegations are contradicted by [ ] a document [attached to or incorporated by reference into the complaint], those allegations are insufficient to defeat a motion to dismiss.") (quoting *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002)).

### III.     Allegations in Complaint

The Complaint—read together with the agreement appended thereto, and deferring to the text of that agreement when the two documents are in tension, *see Moorehead*, 845 F. Supp. 2d at 693 n.1—pertinently alleges as follows:

1.      The parties entered into a Forward Purchase Agreement (the "MCA Agreement") in June 2024. *See* Complaint, DE #1-2, at ¶ 6.

2.      Under the MCA Agreement, Marque sold to Kapitus the sum of $178,100.00 in future receivables, in exchange for a purchase price of $130,000.00, reduced to a "net purchase price" (monies actually remitted to Marque) of $28,392.00. *See* Complaint, DE #1-2, at Exhibit 1 (commencing on page 8 of the PDF file), §§ 3-4, 6.

3.      Marque agreed to remit to Kapitus 16.4% of Marque's receivables, on a weekly basis, until the full sum of $178,100.00 was paid to Kapitus. *Id.* at §§ 3, 7.

4.      The weekly remittance of 16.4% of Marque's receivables was estimated by the parties to equate to $2,571.00. *Id.* at § 8.

5.      Mr. Lukes guaranteed "performance of all of the representations, warranties, covenants" made by Marque but, critically, did not guarantee the repayment of the full purchase price. *See* Complaint, DE #1-2, at Exhibit 1, Guaranty (commencing on page 23 of the PDF file).

6.      While the MCA Agreement, together with the exhibits thereto, is 20 pages long, nowhere does the document explain how or why a "purchase price" of $130,000.00 is reduced to a "net purchase price" of $28,392.00. *See* Complaint, DE #1-2, at Exhibit 1, *passim*. The MCA Agreement does note there to be a "closing fee" of $4,225.00, *id.* at § 5, but such still leaves unaccounted a diminution of $97,383.00. Nor does the Complaint otherwise allege facts to explain this significant disparity. *See* Complaint, DE #1-2, *passim*.

7.      Marque made $35,997.25 in payments under the MCA Agreement. *Id.* at ¶ 11.

8.      The last payment was made on January 9, 2025, in the reduced sum of $92.75, and no payments have been since made. *Id.* at ¶ 13.

9.      Kapitus is now seeking to collect "the principal amount" of the obligation, *id.* at ¶ 17, together with (i) a "default fee" of $2,500.00, *id.*; (ii) returned ACH fees of $1,925.00, *id.*; (iii) legal fees of $36,631.93, *id.* at ¶ 18; and (iv) interest at the rate of 10 percent per annum, *id.* at ¶ 19.

## IV.    Background: Merchant Cash Advances

As noted *supra*, this case concerns an MCA transaction. Such agreements are something of an emerging topic of legal scrutiny, especially in bankruptcy courts where questions as to the validity—and enforceability—of the documents have been regularly addressed in recent years. The core structure of an MCA transaction is that a merchant (normally a small, retail business) is not borrowing money but, rather, is "selling" a specified percentage of *all* future receivables (i.e., revenues)—reduced, conveniently, to an "estimated" weekly sum—until an agreed amount is paid, in exchange for an upfront infusion of cash. That these transactions appear to closely resemble

5

loans (agreements to pay specified monies, on a specified timeline, until principal and interest are repaid in full) is neither coincidence nor folly: the MCA industry at least bears the optics of working to end-run lending laws while furnishing products that pragmatically resemble the small business equivalent of payday loans.

As observed by the United States Bankruptcy Court for the District of New Jersey, when confronted with two MCA contracts: "a putative present sale of rights to payment that do not yet exist . . . is both a metaphysical and legal impossibility. . . . A transfer of future rights to payment—that is, rights that as yet do not exist—cannot occur unless and until the rights to payment arise." *M Design Vill. v. Versant Funding LLC (In re M Design Vill.)*, 2025 Bankr. LEXIS 1778, at *19 (Bankr. D.N.J. July 24, 2025) (quoting *In re Watchmen Sec. LLC*, 2024 Bankr. LEXIS 2871 at *4 (Bankr. S.D. Ind. Nov. 20, 2024) (quoting John F. Hilson & Stephen L. Sepinuck, A "Sale" of Future Receivables: Disguising A Secured Loan as a Purchase of Hope, 9 Transactional Lawyer 14, 15 (2019))).

Another bankruptcy court, also confronted with an MCA arrangement, carefully analyzed the financial realities underlying the transaction and concluded, *inter alia*, "[t]hese economic features, most fundamentally the reality that the Debtor bears the risk of non-collection of receivables with Radium2 bearing little if any of that risk, powerfully show the Agreements to be loans." *J.P.R. Mech. Inc. v. Radium2 Cap., LLC (In re J.P.R. Mech. Inc.)*, 2025 Bankr. LEXIS 1319, at *27 (Bankr. S.D.N.Y. May 30, 2025).

Decisions such as the foregoing—noting MCA contracts to actually be loans—have come with grave consequences for recharacterized lenders. The United States Bankruptcy Court for the Eastern District of North Carolina, upon concluding an MCA transaction to actually be a loan, proceeded to note this meant that "[p]ursuant to applicable New York statutory and case law, the

MCA Agreement is criminally usurious." *In re Williams Land Clearing, Grading, & Timber Logging, LLC*, 2025 Bankr. LEXIS 1201, at *33 (Bankr. E.D.N.C. May 16, 2025). The same court went on to accordingly hold the agreement to be void *ab initio*. *Id.*

As recently as a few weeks ago, another bankruptcy court found certain MCA agreements usurious under Texas law, *In re Denali Constr. Servs.*, 2026 Bankr. LEXIS 712, at *30 (Bankr. N.D. Tex. Mar. 20, 2026), and awarded both treble damages and attorneys' fees to a borrower, *id.* at *31-36. That case—much like this case—involved a particularly lopsided disparity between the monies received by a merchant and the monies obligated to be repaid by the same merchant: "The difference between the amount Plaintiff received ($350,000) and the amount Plaintiff was obligated to repay ($1,499,000), or $1,149,000, represents the interest charged on the loan." *Id.* at *29.

Of course, Maque is not presently a debtor in bankruptcy and this Honorable Court is not hearing claims under chapter 5 of the Bankruptcy Code. Moreover, Virginia does not have a commercial usury restriction other than that applicable through the law governing unconscionability. *See* Va. Code § 6.2-308. Nor does North Dakota (the state in which Marque operated) appear to expressly regulate commercial usury. *See* N.D. Cent. Code § 47-14-09. But the increasing resistance of courts, to the enforcement of MCA contracts, necessarily animates the context of the agreement at issue in this case and some of the quirkier provisions thereof. Those unorthodox provisions, in turn, inform much of this motion.

## V.     Argument: The Complaint Does Not Sufficiently Allege a Contractual Breach on the Part of Marque

Per the express verbiage of the document, the MCA Agreement is not a loan but, rather, a sale of future receivables. So a breach would stem not from a failure of payment per se but, rather, a failure to remit the agreed upon portion of weekly receivables (16.4%). Yet no such allegation

is found in the pleading, with the Plaintiff instead pursuing this civil action in a manner tantamount to the collection of a promissory note.

Under Virginia law, a claim for breach of contract requires a showing of "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA*, 770 S.E.2d 491, 493 (Va. 2015) (quoting *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)). *See also Rogers v. Deane*, 992 F. Supp. 2d 621, 629 (E.D. Va. 2014) (same) (quoting *Filak*, 594 S.E.2d at 614).

Here, a plain reading of the Complaint suggests there is not a legally enforceable obligation, insofar as a sale of $178,100.00 in future receivables, in exchange for a payment of $28,392.00, is unconscionable. *See, e.g.*, *Fransmart, LLC v. Freshii Dev*., LLC, 768 F. Supp. 2d 851, 870-71 (E.D. Va. 2011) ("In Virginia, a contract is unconscionable if it is 'one that no man in his senses and not under a delusion would make, on the one hand, and [that] no fair man would accept on the other. 'The substantive terms of the contract must be so grossly inequitable that it 'shocks the conscience.'") (quoting *Mgmt. Enters., Inc. v. Thorncroft Co., Inc*., 416 S.E.2d 229 (Va. 1992)). No doubt, bartering $178,100.00 in future revenues, in exchange for an upfront cash infusion of $28,392.00, is an arrangement "no man in his senses" would make, as well as one "no fair man" would accept.

Yet, while the unconscionability question may be slightly exotic, the second element of a claim for breach of contract—a showing of a breach by the Defendants—is objectively missing *sub judice*. The Complaint cabins the obligation of Marque as one to make payments, not as one to remit 16.4% of future receivables. This is fundamentally errant, as the MCA Agreement—

8

seemingly by the Plaintiff's deliberate design—is not a promissory note or loan agreement requiring the payment of a sum certain.

If the Complaint were to allege Marque continued to receive revenues and did not remit 16.4% thereof to Kapitus, such may well be an allegation of contractual breach sufficient to conform with the pleading rigors established by *Iqbal* and *Twombly*. Yet the Complaint does not allege Marque received *any* future revenues, much less revenues for which Kapitus did not receive the agreed-upon cut of 16.4%. And such is surely for good reason: Kapitus was notified shortly after Marque closed for business and accordingly cannot, in good faith, allege the existence of any unremitted revenues.

The MCA Agreement insists, *inter alia*, "[t]itle to, responsibility for and risk of loss of the interest in the Receipts shall pass from the Seller to the Purchaser upon execution of this Agreement with respect to the Purchased Amount." MCA Agreement, DE #1-2, at p. 12, § 1.1. Yet, in bringing this suit, Kapitus appears to be endeavoring to re-shift that "risk of loss," by strategically avoiding any allegation as to the existence, *vel non*, of future revenues, and instead treating the MCA Agreement as a loan. Such is not a faithful depiction of the parties' obligations under the MCA Agreement and, as such, does not suffice to adequately allege a breach by Marque.

For many of the same reasons, the pleading also comes well shy of alleging the third prong of a claim for breach of contract: "injury or damage to the plaintiff caused by the breach of obligation." *Ramos*, 770 S.E.2d at 493. Under the terms of the MCA Agreement, the only cognizable injury the Plaintiff could sustain would be in the form of unremitted future revenues. After all, the Plaintiff only bargained for a percentage of future revenues—not outright repayment of a loan. Yet, by failing to allege the existence of unremitted revenues, the Plaintiff has failed to allege facts sufficient to satisfy the third prong of a claim for breach of contract.

9

To be sure, the Defendants are not asserting Kapitus must allege the precise sum of revenues received by Marque and not remitted; such would well exceed the pleading standard for a claim not sounding in fraud. The Defendants, rather, are simply urging that Kapitus must at least allege the *existence* of unremitted revenues—something Kapitus has not done and cannot do in good faith since Kapitus knows Marque closed for business and ceased realizing any revenues whatsoever.

The Complaint thusly relies on a contract that appears to be unconscionable, whilst failing to allege an actual breach of the terms thereof by the Defendants and whilst also failing to allege any economic injury attributable to such a breach. These realities necessarily militate in favor of dismissal.

## VI.    Argument: The Complaint Makes Unclear How Mr. Lukes Has Breached His Guaranty

The Complaint also fails to establish a claim against Mr. Lukes for a breach of his guaranty. This is for two reasons: (i) a failure to allege an underlying contractual breach would necessarily result in a failure to allege a guaranty has been breached; and (ii) since Mr. Lukes did not guaranty repayment, but only the veracity of contractual covenants, it is altogether unclear what provision of his guaranty the Plaintiff asserts to have been dishonored.

On the first point, the argument made above, *see, supra,* § IV, is dispositive. A fair reading of the MCA Agreement (inclusive of the guaranty thereto) makes clear there cannot be a breach of the guaranty unless there is, too, a breach of Marque's primary contractual covenants. Since the Complaint fails to sufficiently plead a claim against Marque, such means the Complaint also fails to plead a claim against Mr. Lukes.

On the second point: the Complaint does not actually allege any specific breach on the part of Mr. Lukes. The Defendant asserts, *inter alia*, "[i]n addition to signing the Agreement in his

10

capacity as an officer/owner/director/member/manager of Merchant, Lukes also signed the agreement as a Guarantor, agreeing to be obligated to **all** terms of the Agreement." Complaint, DE #1-2, at ¶ 20 (emphasis added). Yet this is not so: the guaranty, appended to the MCA Agreement (and attached to the Complaint), makes clear Mr. Lukes is only guaranteeing "performance of all of the representations, warranties, covenants made by [Marque]" in the MCA Agreement (and in related documents also appended thereto). *Id.* at p. 23.

So even if the MCA Agreement were to be construed as a loan, and Kapitus were permitted to proceed with a theory of collecting principal and interest (as seems to be implied in the pleading's *ad damnum* clause, which speaks to "principal" and "interest," not "future receivables"), Mr. Lukes would not have guaranteed such repayment. His guaranty only goes to the veracity of representations and warranties. Yet nowhere does the Complaint identify any representation or warranty that is allegedly untruthful.

Again, this tension is derivative of what the Complaint does not allege: Marque is no longer an operating business and no longer has revenues. So Kapitus cannot allege any representation or warranty, concerning the faithful remittance of future revenues, to have been contravened, since Kapitus knows there are no future revenues. Nor can Kapitus feign naivete as to this reality, since Mr. Lukes notified Kapitus shortly after Marque closed its doors.

At core, the Complaint both misstates the scope of the guaranty signed by Mr. Lukes and fails to allege any cognizable breach thereof. The document vaguely posits, *inter alia*, "[u]pon information and belief, the acts and omissions that constitute default of the Agreement were performed or omitted by, at the direction of, or with the consent of Lukes." Complaint, DE #1-2, at ¶ 14. Yet such is precisely the sort of threadbare pleading forbade by *Iqbal*. And on a plain reading of the pleading, it is truly unclear which provision(s) of Mr. Lukes' guaranty are alleged

to have been breached—much less how any such breach has occasioned the incursion of correlative economic damages.

## VII.    Conclusion

WHEREFORE, the Defendants respectfully pray this Honorable Court (i) dismiss the above-captioned suit; and (ii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: April 15, 2026

By: /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Virginia Bar No. 81556
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Counsel for Marque Dental Laboratory,*
*LLC and Michael Lukes*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of April, 2026, a copy of the foregoing was sent, via first class mail, postage prepaid, to:

Nhon H. Nguyen, Esq.
Nguyen | Ballato
2201 Libbie Avenue
Richmond, VA 23230
*Counsel for the Plaintiff*

/s/ Maurice B. VerStandig
Maurice B. VerStandig

12