**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **KAPITUS SERVICING, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:26-cv-315** |
| | ) | |
| | ) | |
| **MARQUE DENTAL LABORATORY, LLC, and MICHAEL LUKES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COUNTERCLAIM**

Plaintiff and Counterclaim Defendant, Kapitus Servicing, Inc. ("Kapitus"), by and through undersigned counsel, respectfully submits this Memorandum in Support of its Motion to Dismiss the Counterclaim filed by Defendants and Counterclaim Plaintiffs Marque Dental Laboratory, LLC ("Marque") and Michael Lukes ("Mr. Lukes") (collectively, "Marque"),[1] and states as follows:

## INTRODUCTION

Marque sought commercial financing from Kapitus on multiple occasions and Kapitus extended financing to Marque twice. On August 31, 2023, Marque and Kapitus entered into their first Forward Purchase Agreement. Pursuant to that Initial Agreement (which is not at issue in this case), Marque made weekly payments without fail from September 7, 2023 until June 13, 2024.

[1] The term "Marque" is used to collectively refer to Defendants or Counterclaim Plaintiffs for purposes of clarity and consistency. If a distinction between Marque and Mr. Lukes is warranted, such a distinction is clearly made herein.

On June 20, 2024, Marque and Kapitus entered into their second Forward Purchase Agreement, "the Agreement" referenced herein and the Agreement that is the subject of both Kapitus's Complaint and Marque's Counterclaim. This time, however, Marque made but eight weekly payments before the ninth payment – which was to be debited on August 22, 2024 – was returned due to insufficient funds. In the months that followed, Marque made payments in a reduced amount (many of which were also returned for insufficient funds) before ceasing payments altogether in February of 2025. All told, Marque owes Kapitus $146,527.75, plus interest and attorneys' fees.

Kapitus initiated a lawsuit against Marque in the Chesterfield Circuit Court on September 15, 2025. Marque removed the case to this Court, and as part of its Answer, filed a Counterclaim against Kapitus alleging a violation of the Securities and Exchange Act of 1934. This Counterclaim is wholly without merit. It rests on a novel, untested, and unsound theory and does nothing to further the interests of Marque, which otherwise does not dispute the existence of the Agreement and the Agreement's requirement that Marque pay Kapitus.

Marque's Counterclaim alleges that the Forward Purchase Agreement ("Agreement"[2]) entered into between the parties violates Section 10b of the Securities and Exchange Act of 1934 ("the Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC"). SEC Rule 10b-5 prohibits fraud "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

---

[2] The "Agreement" is the Forward Purchase Agreement" executed on June 20, 2024. A copy of the Agreement is attached to Kapitus's Complaint in this case. *See* Dkt. No. 1-2, pp. 8-28 (Ex. 1 to Kapitus's Complaint).

Marque claims the Agreement violates this Rule because the Agreement is a "loan" and a "security" for purposes of the Act and because Kapitus made material misrepresentations and omissions to induce Marque to enter into the Agreement.

Marque's Counterclaim fails in several glaring respects. First, the Counterclaim fails to allege sufficient facts to establish that the Agreement was, in fact, a loan. The Agreement is not a loan because it is a purchase and sale agreement by its express terms in which Plaintiff purchased a specified percentage of Marque Dental's future receivables, and under a totality of the circumstances test under Virginia law, it is also clearly a purchase and sale. Second, even if an agreement is a "loan," to come within the purview of the Act, it must also be a "security." Marque alleges simply that if the Agreement is a loan, then it is also a security. Counterclaim ¶ 47. But the Agreement is not a security because it plainly fails to meet the statutory definition of the term "security" set by the Act and because it fails to satisfy the criteria that courts look for in making such a determination. Third, even if the Agreement were a loan, and even if it were a security (and it is neither), the Counterclaim clearly fails the requirements of the Private Securities Litigation Reform Act ("PSLRA") of 1995, which requires plaintiffs bringing 10b claims to "'state with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind.'" *Tellabs, Inc. v. Makor Issues & Rights, LTD,* 551 U.S. 308, 314 (2007) (quoting 15 U.S.C. § 78u-4(b)(2)). For all of these reasons – explained in depth herein – Kapitus respectfully moves the Court to dismiss the Counterclaim.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Critically, "a court's role under Rule 12(b)(6) is to evaluate the sufficiency of a complaint and . . . a court is not permitted at this stage of the proceedings to 'resolve contests surrounding the facts' or 'the merits of a claim.'" *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024) (quoting *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023)). The court "must accept the facts as alleged as true and draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020)). The Court is of course "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

**ARGUMENT**

The threshold requirement for a securities fraud claim under Section 10(b) and Rule 10b-5 is first and foremost the existence of a "security." The Act regulates "securities" and not simply all manner of commercial or consumer transactions in which the exchange of goods or services for money could occur. Congress did not intend – via the Act – "to provide a broad federal remedy for all fraud." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). Because the Agreement is not a "security," it does not fall within the ambit of Section 10(b) or Rule 10b-5. Marque's unsupported allegation that because the Agreement is purportedly a "loan," it is also a "security," is simply not supported by applicable law. Counterclaim ¶ 15.

**I. The Agreement is not a Loan**

Marque's Counterclaim depends entirely on its unsupported and conclusory theory that the Agreement is a "disguised" and "predatory" loan. Counterclaim ¶¶ 20, 29, Dkt. No. 15. It is not.

Virginia law makes clear that the Agreement is a financing arrangement for the purchase and sale of future receipts and thus, not a loan. When interpreting a contract, a court should examine the document itself and, if unambiguous, apply its plain meaning. *See Pocahontas Mining LLC v. CNX Gas Co., LLC*, 276 Va. 346, 353-54 (2008) ("[w]hen the writing, considered as a whole, is clear, unambiguous, and explicit, a court asked to interpret such a document should look no further than the four corners of the instrument"). In *Graeme v. Adams*, the Virginia Supreme Court clearly held that sales contracts simply do not qualify as loans. In assessing a usury claim, the court held that "[i]t is well settled that on a contract to secure the price or value of work and labor done or to be done, or of property sold, the contracting parties may agree upon one price if cash be paid, and upon as large an addition to the cash price as may suit themselves, if credit be given; and it is wholly immaterial whether the enhanced price be ascertained by the simple addition of a lumping sum to the cash price, or by a percentage thereon. In neither case is the transaction usurious. It is neither a loan or the forbearance of a debt, but simply the contract price of work and labor done or property sold; and the difference between cash and credit in such cases, whether six, ten or twenty per cent, must be left exclusively to the contract of the parties; and no amount of difference fairly agreed on can be considered illegal"). 64 Va. 225, 234 (1873). In 2012, this Court cited *Graeme* and again reiterated that usury laws do not apply to bona fide sales transactions because those transactions were not "loans." *See Galloway v. Bluegreen Vacation Club*, Case No. 3:11cv481, 2012 WL 113862, at *3 (E.D. Va. Jan. 13, 2012).

Here, it is clear from the face of the Agreement that it is not a loan of money or forbearance of an existing debt. Page one of the Agreement has a header stating: "Forward Purchase Agreement (Fixed ACH Delivery)." The body of the Agreement also makes plain that Seller Marque sold the Purchased Amount of receivables and agreed to deliver same through the Specified Amount, which

it could reconcile to the Specified Percentage upon request. Section 1.1 of the Agreement then states:

> Seller and Purchaser intend that the transfer of the interest in the Receipts from Seller to Purchaser constitutes a forward sale, and not a loan, for all legal, practical and business purposes. Seller agrees that the Purchase Price equals the fair market value of the Receipts being purchased as of the date sold that are expected to come into existence in the future in the ordinary course of the operation of Seller's business. Title to, responsibility for and risk of loss of the interest in the Receipts shall pass from the Seller to the Purchaser upon execution of this Agreement with respect to the Purchased Amount.

Dkt. No. 1-2, p. 12, Sale Terms and Conditions § 1.1.

The Agreement goes on to explain that "the Purchase Price equals the fair market value of the Receipts being purchased as of the date sold." *Id.* These terms reflect the economic substance of the transaction. As such, Virginia courts routinely rule that contracts such as the Agreement are not loans. *See* Ex. "A", *Strategic Funding Source, Inc. v. Milton Jules Segal*, No. CL18003803-00, Letter Opinion (Va. Hanover Cir. Mar. 5, 2021) (purchase and sale of future receivables agreement not a loan, noting "[t]he language used shows that the intention of the contract is not to create a loan, but to sell future receivables to Strategic Funding."); Ex. "B", *Kapitus Servicing, Inc. v. Lena LA d/b/a T.J. Nails*, No. CL21-1205, Letter Opinion (Va. Henrico Cir. Feb. 14, 2022) (finding the contract was not a loan but "a factoring agreement where Kapitus agreed to the purchase and sale of future receivables from the defendant").

Even going beyond the plain terms of the Agreement, its other features also plainly indicate that it is not a loan.[3]

---

[3] Also telling is Virginia's exclusion from its usury statutes of any business or investment loan of $5,000 or more. Virginia Code § 6.2-317 states that such loans are excluded from usury laws, specifically that "[n]o person shall, by way of defense or otherwise, avail himself of the provisions of this chapter, or any other statutory or case law relating to usury or compounding of interest, to avoid or defeat the payment of interest, or any other sum, in connection with a loan made to a person for business or investment purposes, if the initial amount of the loan is $5,000 or more."

*a. The Agreement Identifies a Specific Percentage of Future Receivables Owed*

The Purchased Amount is based on a Specified Percentage of Marque's receipts: 16.4%. Dkt. No. 1-2 at p. 8, § 7. The Specified Amount of $2,571.00 per week Kapitus's good faith "estimate of the Specified Percentage due" following its underwriting process. *Id.* at p. 9, § 8. This structure ties Kapitus's recovery to Marque's actual business performance, not to a fixed debt obligation. Accordingly, the Agreement is a forward purchase of receivables and not a loan.

*b. There is a Reconciliation Provision*

Not only does the Agreement contain a "Specified Amount" indicating the weekly payments Marque would be making based on its demonstrated receipts, Section 8 of the Agreement provides that Marque may request reconciliation to adjust the Specified Amount to reflect its actual receipts should its actual receipts change from those at the time of the Agreement's formation. Dkt. No. 1-2, p. 9, § 8. Specifically, the Agreement states that the Specified Amount "shall be reconciled to reflect [Marque's] actual Receipts at [Marque's] request . . . Upon verification of the receipts generated by [Marque], [Kapitus] **shall** adjust the Specified Amount on a going-forward basis to more closely reflect [Marque's] actual Receipts." *Id*. (emphasis added). This process can occur once every 30 days. *Id.*

This provision is a hallmark of a receivables-purchase agreement: the amount collected by the purchaser is tied to the seller's actual business performance, thereby placing the risk of market or business fluctuations on Kapitus, not Marque. If the Agreement were a loan, the borrower would owe a fixed sum regardless of its receipts and regardless of business conditions. The reconciliation provision demonstrates that Kapitus's rate of return is dependent upon Marque's actual revenue,

---

Marque's inflated, inaccurate, and misleading complaints of a 358% interest rate are irrelevant, even if the Court does determine the Agreement to be a loan. This is not a fact Marque is permitted to use in its attempt to avoid paying the money it owes to Kapitus.

the defining feature of a purchase of future receivables. The Agreement is plainly not a loan, and because it is not a loan, it is not a "security" either.

*c. There is an Indefinite Term*

The Agreement states that it "shall have an indefinite term." Dkt. No. 1-2, p. 12, § 1.2. Most traditional "loans" have a set temporal term, with the outstanding principal balance amortized over time. This Agreement does not do that. Instead, it continues indefinitely and – as noted above – allows Marque to reconcile or change its payment terms every 30 days based on fluctuations in its business receipts.

**II. The Agreement is not a Security**

Even if despite the Agreement's express terms the Court were to characterize it as a loan, Marque's claim would still fail because a commercial loan is not a "security" under the Act. Marque's conclusory statement that "[a] loan is a security within the definitional ambit of section 78c(a)(10)" (Counterclaim, ¶ 47) is conclusory at best and misleading and incomplete at worst.

In *Reves v. Earnst & Young*, 494 U.S. 56 (1990), the United States Supreme Court adopted the "family resemblance test" to determine when a "note" is a "security" under the Act. *Reves* establishes that a court presumes a note is a security, but that presumption is rebutted if the note "bears a strong resemblance" to certain categories of instruments that are indisputably *not* securities. *Id.* at 67.

According to *Reves*, the following instruments are *not* securities: a "note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business . . ." *Id.* at 65

(emphasis added). The Supreme Court went on to say that if the "note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash flow difficulties, ***or to advance some other commercial or consumer purpose*** . . .the note is less sensibly described as a 'security'." *Id.* 66 (emphasis added). The Supreme Court specifically mentioned two "notes" by name that are not securities, which bear a resemblance to the Agreement here: short-term notes secured by an assignment of accounts receivable and notes to advance some other commercial or consumer purpose. The Agreement does both of these things: it assigns accounts receivable through the sale to Kapitus and it advances Marque's commercial purposes. *See, e.g.,* Dkt. No. 1-2, p. 15, ¶ 2.13 "Business Purpose" (in which Marque makes the material representation that it is "entering into this Agreement for business purposes.").

The *Reves* case gives yet more guidance from which this Court should determine that the Agreement is not a security. The Supreme Court established a four-part test indicating when a particular transaction is likely to be a security: (1) the transaction is "an investment in a business enterprise rather than as a purely commercial or consumer transaction"; (2) the note is "offered and sold to a broad segment of the public" such that it "establish[es] the requisite 'common trading' in an instrument"; (3) whether the general public is likely to think it is an "investment"; and (4) the lack of a "risk-reducing factor" (like collateral or other applicable regulations) which would suggest that the instrument is actually a security. Kapitus addresses each factor in turn.

*(a) The Agreement is not an "Investment"*

This transaction is not an "investment."[4] Marque has made no allegations tending to show that it is. Marque expressly agreed that the purposes of the funds it sought from Kapitus were for

[4] The focus of this inquiry is on the party bringing the claim under the Act. It is that party who must allege facts sufficient to show that he is an "investor" or that he made an "investment of money" expecting a return on that investment, such that the transaction should be viewed within

"(i) working capital, (ii) business insurance (but not self-insurance programs), (iii) franchise fees, (iv) employee training, (v) the purchase of equipment, (vi) inventory, (vii) business supplies and raw materials, and (viii) the construction, renovation or improvement of facilities (but not the purchase of real estate)." Dkt. No. 1-2, p. 19 "Use of Proceeds Certification." The purpose is plainly not as an investment. It is for business funding.

*i. The Howey Test*

As an aside and to preempt any argument that the Agreement was an "investment contract" and not simply an "investment" for purposes of the Act, Kapitus notes that the Agreement is also not an "investment contract." Should Marque argue that the Agreement was in fact an "investment contract" thereby bringing it under the purview of the Act, Marque would also be mistaken on this front. The Agreement is not an "investment" as that term is used by the Act. But the Agreement is also not an "investment contract" for purposes of the Act, either.

The Act defines a "security" to include an "investment contract" among other things. 15 U.S.C. § 78c(a)(10). The Supreme Court case *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) guides the Court's analysis here. In *Howey*, the Supreme Court set up a long-standing four-part test for determining whether a transaction constitutes an "investment contract" and therefore a security:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.
>
> *Howey*, 328 U.S. at 298–99.

Therefore, a plaintiff seeking to establish that a transaction is an "investment contract" must prove *each* of the four *Howey* elements: (1) an investment of money; (2) in a common

---

the purview of the Act. Under *Daniel*, it is the putative investor who must "give up a specific consideration" in return for a financial interest consistent with the "characteristics of a security." *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979).

enterprise; (3) with an expectation of profits; (4) derived solely from the efforts of the promoter or a third party. Failure to establish any single element is fatal to the claim. *See also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) ("[W]hen a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply."). This Agreement is plainly *not* an investment contract. It fails each element of the *Howey* test.

*(a) Marque did not Invest Money*

Under *Howey*, the Court must ask whether the putative investor – here, Marque – made an "investment of money." The Supreme Court has held that "in every decision of this Court recognizing the presence of a 'security' under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security." *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979). "In every case the purchaser gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security." *Id*. at 560.

But here, Marque did not invest money; it received money. Kapitus paid Marque in exchange for Marque's future receivables. The transaction runs in the opposite direction from *Howey*: Marque was a seller receiving a purchase price, not an investor committing capital to a speculative venture.

Marque's motivation was also purely commercial. The "Use of Proceeds Certification" states that "the entirety of the Purchase Price will be used in the ordinary course of business" and "exclusively for a Business Purpose," defined to include working capital, equipment, inventory, and similar operational uses. Dkt. No. 1-2, at 19. Under *Forman*, "when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply." 421 U.S. at 852–53. Marque used the proceeds for working capital, which is the very definition of

consumption, not investment. Because Marque fails this first prong of the *Howey* test, this transaction is clearly not an investment contract

*(b) There was no Common Enterprise*

This Agreement is no more than a bilateral commercial transaction, and Marque fails to allege facts tending to show that it was more than this. There is absolutely no evidence from the Agreement itself or from Marque's Counterclaim allegations that there was some sort of joint venture or common enterprise between Marque and Kapitus. This was an arm's length deal between a buyer and seller, nothing more.

*(c) Marque had no Expectation of Profits*

Marque did not enter the Agreement expecting "profits" in the *Howey* sense. Its motivation was operational liquidity (e.g., working capital for its business operations), not capital appreciation or a participation in earnings. *See Forman*, 421 U.S. at 852 (defining "profits" as "capital appreciation resulting from the development of the initial investment" or "a participation in earnings resulting from the use of investors' funds"). None of these things happened here.

*(d) Because Marque had no Expectation of Profits, the Fourth Element Does not Apply*

The fourth element is an expectation to derive profits from the efforts of others. Not only does this element plainly not apply here, but the Virginia Supreme Court in *Tanner v. State Corp. Com'n*, 265 Va. 148 (2003) expressly held that "account receivable purchase and sales agreements" were not "investment contracts" for purposes of the Act. Though *Tanner* deals with the *purchasers* of these types of agreements who were bringing a claim under the Act, the case is nevertheless incredibly instructive for its holding that the receivables purchase agreements at issue in that case were not "securities" and thus not within the purview of the Act at all. *Id*. at 155.

*(b) The Agreement Itself is not Offered and Sold to a Broader Public*

The Agreement is not alleged to be "offered and sold to a broad segment of the public." It is a bilateral contract between Kapitus and Marque. It is not traded on any exchange, distributed to investors, or sold to the general investing public. Marque makes no attempt to even allege that it meets these criteria in any way.

*(c) The Agreement is not Likely Perceived by the Public as an "Investment"*

This Agreement – the purchase of future receivables – is not likely to be perceived by the general public as an "investment." This bilateral contract between two business entities bears no resemblance to the types of instruments that the investing public would reasonably perceive to be "securities" like stocks or mutual funds. And again, Marque makes no attempt to allege that the Agreement is or could legitimately be interpreted as a security or an investment by the broader public. It is not a stock, bond, or any other of the many, many "investments" outlined in the Act itself. *See* 15 U.S.C. § 78c(10) (defining the term "security" to include a list of common – and less common – investment options).

*(d) The Agreement Evidences Risk Reducing Factors*

Finally, Marque fails to allege facts tending to show a lack of "risk-reducing factor[s]" like collateral, insurance, or regulation. *Reves*, 494 U.S. at 69. Indeed, it is obvious that such allegations would fail, as this Agreement provides for a security interest in Collateral (as defined therein), a guaranty of Marque's performance of the representations, warranties, and covenants it made in the Agreement, and is plainly regulated under Article 9 of the Uniform Commercial Code and applicable state laws in ways typical "securities" are not. *See, e.g., Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 309-10 (2d Cir. 2023) (finding that the existence of a "first priority security interest" in intangible and tangible assets to be a risk-reducing factor weighing against the

conclusion that the transaction at issue was a security); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1539 (10th Cir. 1993) (finding that collateralization is a risk-reducing factor that "favors finding that the [transactions] are not securities.") (abrogation on other grounds recognized in *Johnson v. Heath*, 56 F.4th 851 (10th Cir. 2022)).

Under the *Reves* test, the Agreement bears a strong family resemblance to the categories of notes that are not securities, particularly notes evidencing commercial financing. Marque's bald assertion that the Agreement is a loan and that "[a] loan is a security" under Section 78c(a)(10) (Counterclaim ¶ 47) are both bare legal conclusion that this Court simply cannot accept as true. *See Iqbal*, 556 U.S. at 678. As demonstrated herein, the Agreement is not a security under the applicable test, nor has Marque alleged facts tending to show that it is. In the absence of these facts, the Act does not apply to this transaction and, because it does not, the Counterclaim fails. Accordingly, the Counterclaim must be dismissed on this basis alone.

**III. The Counterclaim Fails to Plead Sufficient Facts to Show Scienter**

The Act proscribes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240-10b-5(b). In 1995, however, Congress passed the Private Securities Litigation Reform Act ("PSLRA") "[a]s a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 313. "Exacting pleading requirements are among the control measures Congress included in the PSLRA." *Id*. Specifically, the PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud." *Id.* Not only that, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*

at 314 (quoting 15 U.S.C. § 78u-4(b)(2)). "To qualify as 'strong' within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Id.* The keywords here are "cogent" and "compelling."

Not only must a plaintiff plead facts tending to show that a 10b-5 defendant made untrue statements of material fact or omitted a material fact necessary to make the statements not misleading, it must ***also*** allege facts supporting a ***strong inference*** of an intent to deceive, manipulate, or defraud. Marque fails on both fronts.

*a. Marque Fails to Plead Facts Tending to Show Materially False Statements or Omissions*

Marque alleges three instances of purported material misrepresentations or omissions:

(i) "'Seller and Purchaser intend that the transfer of the interest in the Receipts from Seller to Purchaser constitutes a forward sale, and not a loan, for all legal, practical, and business purposes,' when the transaction occasioned by the agreement is, in actuality, a loan." Counterclaim ¶ 35.

(ii) "[D]espite being a loan, the MCA Agreement does not set forth an interest rate and thereby omits a material fact." Counterclaim ¶ 37.[5]

[5] Marque again insists that the Agreement resulted in an interest rate of 358% per annum (Counterclaim ¶ 29) because the Agreement "provides for Kapitus to tender $28,392.00 to Marque in exchange for Marque agreeing to barter $178,100.00 in future revenues to Kapitus." Counterclaim ¶ 28. Kapitus noted in its Response in Opposition to Marque's Motion to Dismiss that this calculation is incomplete and misleading because it fails to recognize that, by virtue of the transaction, Marque received the benefit of a credit of $97,383.00 to its prior obligations to Kapitus. *See* Mem. Opp. Defs.' M. Dismiss, p. 8-9. It also conclusorily imposes a term on the Agreement, when in fact, no such term exists because a change in Marque's receipts and corresponding reconciliation of the payments upon Marque's request would continue to alter when the full Receipts Purchased Amount would ultimately be paid. *See* Agreement, Section 1.2.

(iii) "[T]he Guaranty purports to only be a guaranty of the veracity of representations, warranties, and covenants, but as alleged by Kapitus [in its Complaint] is a guaranty of full performance under the MCA Agreement." Counterclaim ¶ 38.

None of these constitutes a misrepresentation of fact and none is sufficient to support a claim of 10-b5 securities fraud.

As for allegation (i), the Agreement includes language indicating that the Agreement is not a loan. This is not a material misrepresentation of fact. It is a statement of agreed intent and a statement of the parties' interpretation of the nature of the Agreement. The parties agreed that they understood the Agreement was not a loan, but they also jointly include a provision in the improbable event that a court concludes that it is. Section 1.1(d) of the Agreement states:

> [I]n the event that a court ignores the intent of the parties that the Transaction Documents be treated as a forward purchase of Receipts, and further determines that the arrangement creates a loan or other indebtedness rather than a completed forward sale of Receipts, and further determines that under that court-determined arrangement that the PURCHASER has charged or received 'interest,' and further determines that the amount of interest is in excess of the highest applicable rate, the imputed rate so determined shall automatically be reduced to the maximum rate permitted by applicable law and Purchaser shall promptly refund to Seller as liquidated damages any amount received by Purchaser in excess of such maximum lawful rate.

Dkt. No. 1-2, p. 12, Sale Terms and Conditions § 1.1(d) (emphasis in original).

Thus the Agreement contains a blue pencil provision allowing for the unlikely possibility that – despite the clear terms of the Agreement – there could be disagreement about the legal interpretation of the transaction and provides applicable terms in the event of that contingency.

This is not a situation where Kapitus is alleged to have pressured Marque into entering the Agreement. This is not a situation where Marque alleges Kapitus made statements or promises

outside the terms of the Agreement that it then did not fulfill.[6] In fact, the Agreement states that it embodies "the entire agreement between Seller, Guarantor(s), and Purchaser and supersede[s] all prior agreements and understandings relating to the subject matter hereof." Dkt. No. 1-2, p. 18, § 4.11. Marque's Counterclaim is based entirely on the Agreement itself. And what the Agreement evidences is a situation where both parties agreed that the legal form of the agreement was a purchase and sale and agreed to a "savings clause" in case their understanding was later determined to be mistaken. When a plaintiff "does not plead factual allegations to suggest that Defendants did not actually believe" forward-looking statements or when a plaintiff "does not allege that there were embedded statements of fact that were false" contained within the statements of opinion, then this is insufficient to support the type of claim that has been made here. *In re Marriott Int'l, Inc., Customer Data Security Breach Litigation*, 543 F. Supp. 3d 96, 119-120. (discussing whether statements of optimism about the future of a business deal satisfied the elements of the Act and determining that they did not). This is so because the PLSRA contains a safe harbor provision for "forward looking statements and the 'bespeaks caution' doctrine." *Id*. at 121 (citing 15 U.S.C. § 78u-5(i)(1); additional citations omitted). Specifically, when statements are "forward looking," "accompanied by 'meaningful cautionary language' or [] immaterial" then they are not material misrepresentations or omissions for purposes of a Rule 10b action. *Id.* (citing *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 218-19 (4th Cir. 1994) (affirming dismissal of a 10(b) and 10b-5 motion to dismiss involving cautionary language).

The "savings clause" here is clearly forward looking: It starts with the phrase "In the event . . ." and then identifies a future, hypothetical occurrence. The language is also accompanied by

---

[6] Notably, Marque does not dispute that it received the benefit of the $130,000 Purchase Price that it accepted and has never attempted to return to Kapitus.

"meaningful cautionary language" indicating that both parties acknowledge a risk, however remote, that a court could interpret the Agreement contrary to the parties' intent. To be protected by the "safe harbor" provision, the "cautionary language must contain detailed language tailored to the specific risks the company faces." *Id.* For all the reasons explained *supra* this is not a security, but even if it were, the language is plainly forward-looking and contains detailed language about the risk at issue such that it would fall within the safe harbor provision of the Act and not be actionable.

As for allegation (ii), for reasons already addressed, the Agreement *does* include a "savings clause" that *does* contain an interest rate *if* the Agreement is determined to be a loan. Thus, the allegation that there is no interest rate if the Agreement is (incorrectly) determined to be a loan is demonstrably incorrect – disproven by the very document upon which the Counterclaim relies.

As for allegation (iii) concerning Marque's position on the enforceability of the guaranty clause, it mixes Kapitus's legal position and allegations in its Complaint with the plain terms of the Guaranty. It does so in an attempt to assert the existence of a material representation in a document that simply does not contain the language Mr. Lukes wants it to. If Marque or Mr. Lukes disagreed with Kapitus's legal position in its Complaint that the Agreement was enforceable as to Mr. Lukes (it did), then Marque and Mr. Lukes could have addressed that argument in their Memorandum in Support of their Motion to Dismiss. And they did. This is nothing more than a disapproving mention of Kapitus's legal position taken in its Complaint, nowhere included in the Agreement Marque sued upon. So again, this is not a material misrepresentation of Kapitus

expressed in the Agreement, but is rather a legal interpretation of the Agreement's provisions later in time to when the parties transacted the Agreement.[7]

In sum, the Counterclaim fails to allege an actionable material misrepresentation of fact or material omission of fact. Even if the Agreement were determined to be a loan (it is not) and determined to be within a category of loan that qualifies as a security for purposes of the Act (it is not), the Counterclaim nevertheless fails for these reasons and should be dismissed.

*b. Marque Fails to Plead Facts Tending to Show a Strong Inference of Scienter*

As early as 1976 – and nearly twenty years before the PSLRA's heightened pleading requirements took effect – the Supreme Court held that a private cause of action for damages under 10(b) and Rule 10b-5 will not lie "in the absence of any allegation of 'scienter' intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). In 1995, the PSLRA heightened the pleading standard required to establish that scienter. This heightened standard was adopted "to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs*, 551 U.S. at 322. Under the PSLRA, general allegations of motive and opportunity are insufficient to establish scienter; the complaint must identify the specific statements or omissions that are alleged to be misleading and set forth the reasons why those statements were misleading at the time they were made. *Id.* at 321; *see also* 15 U.S.C. § 78u-4(b)(1). Under both frameworks, the Counterclaim fails.

---

[7] Moreover, Mr. Lukes – as the guaranty – guaranteed the performance of the terms of the Agreement by Marque of all of the representations and warranties in the Agreement. Marque breached the representations and warranties (and therefore, the Agreement), and he is thus liable for the debt under the performance guaranty.

The Counterclaim's scienter allegations fail to satisfy even the basic *Iqbal/Twombly* plausibility standard, let alone the heightened requirements of the PSLRA. The entirety of Marque's scienter allegations consists of the following:

(i) "Kapitus made these misrepresentations and omissions with scienter, as Kapitus is motivated to deceive merchants (like Marque) and their principals (like Mr. Lukes)." Counterclaim ¶ 39.

(ii) "Specifically, Kapitus would not garner as much business if Kapitus disclosed transactions to actually be loans, because presentation of the associated interest rates would cause potential counterparties to decline to enter into agreement on such conscious-shocking terms." Counterclaim ¶ 40.

(iii) "It is further evident Kapitus made these misrepresentations and omissions with scienter insofar as the inclusion of these misrepresentations – and the exclusion of these omitted material terms – from Kapitus's standardized agreement permits Kapitus to conduct business in states with commercial usury limits, by allowing Kapitus to feign to be a purchaser and not a lender." Counterclaim ¶ 40.

These strained allegations based on fabricated devious intention are textbook examples of the conclusory pleading that *Iqbal* and *Twombly* prohibit. They contain no factual allegations whatsoever. They are entirely speculative and self-serving. Marque does not identify either the facts constituting the alleged violation, ***or*** the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud" as the Supreme Court required in *Tellabs.* 551 U.S. at 313. There are no advertising materials. There are no emails or verbal statements from Kapitus to Marque. There are no factual allegations concerning the circumstances under which the Agreement was negotiated or executed. The Counterclaim contains nothing more than a bare

assertion that Kapitus was "motivated to deceive." Counterclaim ¶ 39. This is a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements" if there ever was one. *Iqbal*, 556 U.S. at 678.

Not only that, the inclusion of the "savings clause" at Section 1.1 entirely negates Marque's scant and conclusory theories of scienter. Section 1.1(d) of the Agreement states:

> [I]n the event that a court ignores the intent of the parties that the Transaction Documents be treated as a forward purchase of Receipts, and further determines that the arrangement creates a loan or other indebtedness rather than a completed forward sale of Receipts, and further determines that under that court-determined arrangement that the PURCHASER has charged or received 'interest,' and further determines that the amount of interest is in excess of the highest applicable rate, the imputed rate so determined shall automatically be reduced to the maximum rate permitted by applicable law and Purchaser shall promptly refund to Seller as liquidated damages any amount received by Purchaser in excess of such maximum lawful rate.

Dkt. No. 1-2, p. 12, Sale Terms and Conditions § 1.1(d) (emphasis in original).

If Kapitus were truly trying to deceive Marque – and more importantly, if there truly were a "strong inference" of scienter – then why in the world would Kapitus include a contractual provision that (a) expressly acknowledges the possibility of recharacterization, however remote, (b) provides a built-in remedy in the event of such a recharacterization, and (c) ensures that Marque is made whole if the transaction is determined to impose excessive interest? This clause on its face clearly demonstrates transparency and not concealment. This is risk allocation, not fraud.

In cases such as this, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. But even then, Marque's "inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Id*. Considering both Marque's incredibly weak and vague allegations along with Kapitus's "plausible, nonculpable" inclusion of § 1.1(d) in the Agreement, there is very clearly no factual support for

any type of scienter, much less a "strong inference" of it. This utter failure to plead *any* facts tending to show scienter – much less compelling or cogent ones – is fatal to the 10b-5 claim. The Counterclaim should be dismissed in its entirety.

**Conclusion**

For the foregoing reasons, Kapitus respectfully requests that this Court grant its Motion to Dismiss the Counterclaim and for whatever other appropriate relief this Court may order.

Dated: September 14, 2026

Respectfully submitted,

**KAPITUS SERVICING, INC.**

*By Counsel*

/s/

Laura Maughan (VSB #87798)
Andrew Biondi (VSB #48100)
Sands Anderson, PC
919 E. Main Street, Suite 2300 (Zip 23219)
PO Box 1998
Richmond, VA 23218
(804) 648-1636 (Main)
lmaughan@sandsanderson.com
abiondi@sandsanderson.com

**Use of Artificial Intelligence**

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting *pro se*) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

/s/
Laura Maughan (VSB #87798)
Sands Anderson PC

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of September 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification to the CM/ECF users noted below:

Maurice B. VerStandig, Esq.
Virginia Bar No. 81556
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Counsel for Marque Dental Laboratory, LLC and Michael Lukes*

/s/
Laura Maughan (VSB #87798)
Sands Anderson PC