**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

KAPITUS SERVICING, INC.,

Plaintiff, Case No. 3:26-cv-00315

v.

MARQUE DENTAL LABORATORY, LLC
and MICHAEL LUKES,

Defendants.
______________________________________/

**OPPOSITION TO MOTION TO DISMISS COUNTERCLAIM**

Come now Marque Dental Laboratory, LLC ("Marque") and Michael Lukes ("Mr. Lukes") (collectively, the "Counter-Plaintiffs"), by and through undersigned counsel, in opposition to the *Motion to Dismiss Counterclaim* (the "Motion"), ECF No. 19,[1] filed by Kapitus Servicing, Inc. ("Kapitus" or the "Counter-Defendant") and state as follows:

## I. Introduction

Kapitus is in the business of extending loans—at nosebleed interest rates—to struggling small businesses whilst disguising the resulting transactions as "forward sales" of inchoate, as-yet-non-existent future accounts receivable. In so doing, Kapitus plays an outsized role in the emerging merchant cash advance ("MCA") industry, gussying up the age-old business of loan sharking with a faux legitimacy just enticing enough to siren call merchants (like Marque) and their principals (like Mr. Lukes) before the inevitable epiphany of having been duped strikes too late. The MCA products peddled by Kapitus are—in essence—the corporate equivalent of payday loans. Yet, unlike the grifters siphoning an outsized share of blue collar biweekly earnings, MCA entities like

[1] References to the "Motion," set forth *infra*, include references to the memorandum of law filed in support of the Motion at ECF No. 20.

Kapitus have neither the dignity nor integrity to so much as admit they are in the lending business, instead perpetrating the ruthless con of simply "purchasing" a business' future flow of revenues or some percentage thereof.

Case law has begun to offer courts guidelines by which to differentiate between when a transaction is a *bona fide* sale of an account receivable (like a factoring agreement) and when a transaction is a disguised loan. This field of precedent is still evolving but is sufficiently mature as to present the mixed inquiries of fact and law that are necessary to ascertain when a "sale" is really a loan. By seemingly every such rigor, Kapitus' agreement at issue in this case is, in reality, a loan. And such may well be why—as Kapitus so proudly notes in its own Motion—the underlying agreement even has a savings clause governing what happens if a court, such as this Honorable Court, sees fit to acknowledge Kapitus' business model to be founded upon the virtues of 76 trombones entering a big parade.

What appears to have gone as-yet-unobserved in this burgeoning legal field, though, is one of the many ramifications of the aforesaid confidence scheme: loans are securities, Kapitus is in the business of selling merchants on the notion of entering into those securities agreements, and the misrepresentations of both omission and commission are thusly violative of section 10b of the Securities Exchange Act of 1934 (the "Act") and Rule 10b-5 ("Rule 10b-5") promulgated thereunder by the Securities and Exchange Commission.

To be sure, myriad courts have found MCA agreements to be disguised loans. Some courts have held those loans to be usurious. Others have noted them to be criminal. Many have found them rescindable or voidable. And some—in the context of bankruptcy cases—have been afforded occasion to contemplate whether or not the loans are actually fraudulent conveyances. Yet it appears no court has, to-date, been tasked with assessing whether or not the frauds innate in an

MCA transaction run contra to Rule 10b-5.[2] In a counterclaim (the "Counterclaim"), ECF No. 15, Marque and Mr. Lukes ask this Honorable Court to make such a finding.

## II. Standard

The Federal Rules of Civil Procedure permit a party to seek dismissal for, *inter alia*, a pleading's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To survive such a motion to dismiss, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009), as exemplified by "enough facts to state a claim to relief that is plausible on its face" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In assessing a complaint's allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555. *See also Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013) ("It is now well established that mere conclusory and speculative allegations are not sufficient to withstand a motion to dismiss."). Conversely, however, in deciding a motion to dismiss for failure to state a claim for relief, ". . . all inferences must be drawn in favor of the non-moving party. . ." *Russo v. United States*, 37 F. Supp. 2d 450, 456 (E.D. Va. 1999).

## III. Allegations in Counterclaim

The Counterclaim pertinently alleges as follows:

---

[2] After the filing of the counterclaim instantly at issue, three suits were filed against unrelated MCA entities, by counterparties unrelated to Marque and Mr. Lukes, in the United States Bankruptcy Court for the District of North Dakota, with a Rule 10b-5 claim being included in each such suit. *See Jade Presents, LLC v. Rocket Capital NY, LLC*, Case No. 26-07017 (Bankr. D.N.D. 2026); *Jade Presents, LLC v. Direct Capital Source Inc.*, Case No. 26-07018 (Bankr. D.N.D. 2026); *Jade Presents, LLC v. Unique Funding Solutions LLC*, Case No. 26-07019 (Bankr. D.N.D. 2026). Suffice it to posit, none of those cases have as-yet reached a merits-based resolution or the making of any legal conclusions on the Rule 10b-5 issue.

1. The parties entered into a Forward Purchase Agreement (the "MCA Agreement") in June 2024. *See* Counterclaim, ECF No. 15, at ¶¶ 26-27.

2. The MCA Agreement provides for Kapitus to transfer $28,392.00 to Marque and for Kapitus, in turn, to receive $178,100.00 in future revenues from Marque. *Id.* at ¶ 28.

3. Mr. Lukes guaranteed the performance of Marque under the MCA Agreement. *Id.* at ¶¶ 30, 32.

4. The MCA Agreement provides, *inter alia*, "Seller and Purchaser intend that the transfer of the interest in the Receipts from Seller to Purchaser constitutes a forward sale, and not a loan, for all legal, practical and business purposes," when the transaction occasioned by the agreement is, in actuality, a loan. *Id.* at ¶ 35.

5. The MCA Agreement is actually a loan, *id.* at ¶ 36, but does not set forth an interest rate, *id.* at ¶ 37, which—if set forth therein—would amount to 385.88% per annum, *id.* at ¶ 29.

6. Had the MCA Agreement been disclosed to be a loan, with the aforesaid interest rate, Marque would not have entered into the agreement, *id.* at ¶ 41, and Mr. Lukes would not have guaranteed performance thereunder, *id.* at ¶ 42.

7. Kapitus is incentivized to disguise that its MCA Agreements are actually loans because (i) such deceives merchants and their principals into signing these MCA Agreements, *id.* at ¶ 39; (ii) Kapitus would not garner as much business if it disclosed its transactions to be loans with unconscionable interest rates, *id.* at ¶ 40; and (iii) Kapitus would not be able to conduct business in states with commercial usury rates if Kapitus acknowledged its product to be a usurious loan.

## IV. Background: Merchant Cash Advances

As noted *supra*, this case concerns an MCA transaction. Such agreements are something of an emerging topic of legal scrutiny, especially in bankruptcy courts where questions as to the

validity—and enforceability—of the documents have been regularly addressed in recent years. The core structure of an MCA transaction is that a merchant (normally a small, retail business) is not borrowing money but, rather, is "selling" a specified percentage of *all* future receivables (i.e., revenues)—reduced, conveniently, to an "estimated" weekly sum—until an agreed amount is paid, in exchange for an upfront infusion of cash. That these transactions appear to closely resemble loans (agreements to pay specified monies, on a specified timeline, until principal and interest are repaid in full) is neither coincidence nor folly: the MCA industry at least bears the optics of working to end-run lending laws while furnishing products that pragmatically resemble the small business equivalent of payday loans.

As observed by the United States Bankruptcy Court for the District of New Jersey, when confronted with two MCA contracts: "a putative present sale of rights to payment that do not yet exist . . . is both a metaphysical and legal impossibility. . . . A transfer of future rights to payment—that is, rights that as yet do not exist—cannot occur unless and until the rights to payment arise." *M Design Vill. v. Versant Funding LLC (In re M Design Vill.)*, 2025 Bankr. LEXIS 1778, at *19 (Bankr. D.N.J. July 24, 2025) (quoting *In re Watchmen Sec. LLC*, 2024 Bankr. LEXIS 2871 at *4 (Bankr. S.D. Ind. Nov. 20, 2024) (quoting John F. Hilson & Stephen L. Sepinuck, A "Sale" of Future Receivables: Disguising A Secured Loan as a Purchase of Hope, 9 Transactional Lawyer 14, 15 (2019))).

Another bankruptcy court, also confronted with an MCA arrangement, carefully analyzed the financial realities underlying the transaction and concluded, *inter alia*, "[t]hese economic features, most fundamentally the reality that the Debtor bears the risk of non-collection of receivables with Radium2 bearing little if any of that risk, powerfully show the Agreements to be

loans." *J.P.R. Mech. Inc. v. Radium2 Cap., LLC (In re J.P.R. Mech. Inc.)*, 2025 Bankr. LEXIS 1319, at *27 (Bankr. S.D.N.Y. May 30, 2025).

Decisions such as the foregoing—noting MCA contracts to actually be loans—have come with grave consequences for recharacterized lenders. The United States Bankruptcy Court for the Eastern District of North Carolina, upon concluding an MCA transaction to actually be a loan, proceeded to note this meant that "[p]ursuant to applicable New York statutory and case law, the MCA Agreement is criminally usurious." *In re Williams Land Clearing, Grading, & Timber Logging, LLC*, 2025 Bankr. LEXIS 1201, at *33 (Bankr. E.D.N.C. May 16, 2025). The same court went on to accordingly hold the agreement to be void *ab initio*. *Id.*

As recently as this past March, another bankruptcy court found certain MCA agreements usurious under Texas law, *In re Denali Constr. Servs.*, 2026 Bankr. LEXIS 712, at *30 (Bankr. N.D. Tex. Mar. 20, 2026), and awarded both treble damages and attorneys' fees to a borrower, *id.* at *31-36. That case—much like this case—involved a particularly lopsided disparity between the monies received by a merchant and the monies obligated to be repaid by the same merchant: "The difference between the amount Plaintiff received ($350,000) and the amount Plaintiff was obligated to repay ($1,499,000), or $1,149,000, represents the interest charged on the loan." *Id.* at *29.

Of course, Maque is not presently a debtor in bankruptcy and this Honorable Court is not hearing claims under chapter 5 of the Bankruptcy Code. Moreover, Virginia does not have a commercial usury restriction other than that applicable through the law governing unconscionability. *See* Va. Code § 6.2-308. Nor does North Dakota (the state in which Marque operated) appear to expressly regulate commercial usury. *See* N.D. Cent. Code § 47-14-09. But the increasing resistance of courts, to the enforcement of MCA contracts, necessarily animates the

context of the agreement at issue in this case and some of the quirkier provisions thereof. Those unorthodox provisions, in turn, inform much of this brief.

## V. Argument: The Motion Should be Denied

### a. The Agreement is a Loan

The Counterclaim is premised upon the notion that the MCA Agreement is a disguised loan, with Marque and Mr. Lukes having been duped by Kapitus into believing the transaction was really a sale. The parties thusly seem to agree that for the Counterclaim to prove successful, the MCA Agreement will need to be found to be a loan. Yet whereas Kapitus suggests such to be implausible on the face of the pleading, case law reveals such a finding is not merely plausible but, indeed, quite likely.

"A rose by any other name would smell as sweet." William Shakespeare, *Romeo and Juliet*, act 2, sc. 2. And a loan by any other name is still a loan. Which is why a sister court, just a few months ago, observed Kapitus' form of agreement to likely be that of a disguised loan:

> When interpreting contracts under Virginia law, courts should look at words in the context of the entire agreement. Kapitus, under the Agreement, has no right to exert control over the receivables except to the extent it may withdraw agreed periodic payments; in the event of default, it may pursue its interest in the full amount of the receivables, but only up to the amount it is still owed; and once Kapitus receives the amount it is owed, it loses what few rights it had to control the receivables. **Kapitus's rights to the receivables under the Agreement suggest that the Agreement may be merely a loan contract rather than a purchase agreement**, and Kapitus a secured lender instead of a purchaser and owner of the receivables.

*Kapitus Servicing, Inc. v. Monreal (In re Monreal)*, 2026 Bankr. LEXIS 1572, at *10 n.6 (Bankr. W.D. Tex. June 18, 2026) (emphasis added) (citing *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 355 (Va. 2019)).

The notion of a lender disguising a loan document, and using such disguise to the detriment of a borrower, has informed Virginia case law for more than 80 years, with the Commonwealth's highest court eloquently noting:

> The cupidity of lenders, and the willingness of borrowers to concede whatever may be demanded or to promise whatever may be exacted in order to obtain temporary relief from financial embarrassment, as would naturally be expected, have resulted in a great variety of devices to evade the usury laws; and to frustrate such evasions the courts have been compelled to look beyond the form of a transaction to its substance, and they have laid it down as an inflexible rule that the mere form is immaterial, but that it is the substance which must be considered.

*Van Dyke v. Commonwealth*, 17 S.E.2d 366, 369 (Va. 1941) (quoting 27 R.C.L. Usury, 211 (1920)). *See also Chakales v. Djiovanides*, 170 S.E. 848, 862 (Va. 1933) ("It is also well settled that in determining whether a particular contract was a contract for the loan of money for an usurious consideration, or a legitimate brokerage contract or a legitimate contract for the sale of credit, the courts will disregard its form and look to its substance.").

In more modern parlance, courts confronting MCA agreements such as the one *sub judice* have developed a multi-prong test to ascertain whether the substance of a contract actually comports with the form of a sales agreement or, rather, amounts to a disguised loan: ". . . '(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.'" *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241, at *3 (2d Cir. June 8, 2023) (quoting *Principis Cap., LLC v. I Do, Inc.*, 201 A.D.3d 752 (N.Y. 2d Dep't 2022); citing *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664 (N.Y. 2d Dep't 2020)). *See also In re Williams Land Clearing, Grading, & Timber Logging, LLC*, 2025 Bankr. LEXIS 1201, at *23 (Bankr. E.D.N.C. May 16, 2025) (discussing similar criteria) (citing *Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 820 (Bankr. D. Mont. 2021)).

Here, the at-issue agreement contains only an illusory reconciliation clause. Per its own terms, the reconciliation clause may not be exercised more than "once every 30 days." *See* MCA Agreement, ECF No. 1-2, at § 8 ("Once the Seller elects to conduct a reconciliation, either Party may thereafter request a reconciliation once every 30 days."). So if Marque were to see a sharp

drop in sales immediately following a reconciliation (something that would seem likely if a reconciliation were requested when sales started to drop and the drop thereafter continued), there would be no recourse for 30 days. And for those 30 days, the monies collected by Kapitus would not be an accurate percentage of collected receivables but, rather, naked payments on a loan.

It bears notation that Marque, when still in business, was located in Fargo, North Dakota. The notion that a business in North Dakota could see sales dip in the winter months is unsurprising. Yet the MCA Agreement provides that if Marque asks for a reconciliation when numbers decline in the first week of January, Marque cannot then ask for another reconciliation until February—even if snow drifts force a precipitous plummeting of sales in the intervening weeks. Still, for those intervening weeks, monies will continue to be paid to Kapitus. And such is, no doubt, a leading indicator that the MCA Agreement is really a loan, with Kapitus collecting a sum of money wholly unmoored to Marque's collection of receivables.

Moreover, following a default (which would likely occur if Marque could not afford to make payments in the 30 days following a reconciliation), Marque's right to reconciliations is forfeited *en toto*. *See id.* ("**SELLER SHALL NOT BE ENTITLED TO ANY RECONCILIATION IF SELLER HAS DEFAULTED UNDER ANY OF THE TRANSACTION DOCUMENTS**.") (capitalization and bold in original).

Case law teaches the operative inquiry to be whether or not a reconciliation is "unavailable in practice." *Spig Indus., LLC v. Novac Equities LLC*, 2025 U.S. Dist. LEXIS 208356, at *42 (S.D.N.Y. Oct. 22, 2025). Where, as here, a default (no matter how minor) forever precludes a reconciliation, and there is a temporal limit on reconciliations, logic well dictates that reconciliations are "unavailable in practice."

As a necessary byproduct of the MCA Agreement not having a true reconciliation clause, the document *does* have a finite term: the total debt owed to Kapitus ($178,100.00) divided by the weekly payments ($2,571.00), which equals 70 weeks (albeit with a lower payment in the final week). There is no genuine mechanism to reconcile the weekly sum, and, accordingly, no genuine mechanism to alter the finite term of the agreement. Much like a traditional loan, the contract is for a fixed duration.

In terms of recourse in the event of a bankruptcy, this case is actually demonstrative unto itself: ". . . when Marque ceased conducting business, and notified Kapitus of such, Kapitus simply proceeded to regard the remaining 'receivables' as an unpaid loan and to pursue collection activities—to and through the commencement of this very lawsuit." Counterclaim, ECF No. 15, at ¶ 15.

To be sure, while Marque is not presently in bankruptcy, the situation is comparable to a bankruptcy: the entity is no longer operating and there are no revenues left for Kapitus to collect. So Kapitus has done just what the MCA Agreement would allow in the event of an actual bankruptcy: bring suit and chase Mr. Lukes on his absolute guaranty. In so doing, Kapitus looks to rely on a provision of the MCA Agreement that makes it a breach to go out of business without Kapitus' consent. *See* MCA Agreement, ECF No. 1-2, at § 3.1(c). And Kapitus has looked to a similar provision (of the same MCA Agreement) as a basis to justify this lawsuit. *See Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss*, ECF No. 9, at § II(c) ("If Marque ceased doing business without Kapitus's written consent or an assumption agreement by a successor – as Defendants' own Motion implicitly concedes – then Marque directly breached this provision.").

So, yes, Kapitus would have recourse—in the form of pursuing Mr. Lukes' guaranty—if a bankruptcy were filed. And Kapitus would be able to raise, at that juncture, the same exact arguments being raised in this case: having the temerity to shut down the business and file for bankruptcy is, stunningly, an event of default sufficient to trigger recourse on Mr. Lukes' absolute guaranty.

**b. The Loan is a Security**

As a general rule of law—dating back to the drafting of the Act—notes are securities. The plain language of the United States Code reinforces this point. Case law buttresses this reality. And Kapitus is errant in urging an exotic exception to this general rule (i) is applicable *sub judice*; and (ii) ought to be enforced on a motion to dismiss.

By way of a starting point, the Act defines "security" as including, *inter alia*, ". . . any note," but as excluding, *inter alia*, ". . . any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." 15 U.S.C. § 78c(a)(10). And while—as Kapitus ably acknowledges in the Motion—there is a narrow realm of exception to notes being securities, even Kapitus' favored case instructs there to exist a robust (albeit rebuttable) presumption that a note is a security. *See Reves v. Ernst & Young*, 494 U.S. 56, 67 (1990).

That presumption is only rebutted by a showing that a promissory note "bears a strong resemblance," *id.* at 67, to (i) a consumer financing note; (ii) a home mortgage; (iii) "a short-term note secured by a lien on a small business or some of its assets;" (iv) "the note evidencing a 'character' loan to a bank customer;" (v) "short-term notes secured by an assignment of accounts receivable;" or (vi) "a note which simply formalizes an open-account debt incurred in the ordinary

course of business (particularly if, as in the case of the customer of a broker, it is collateralized)." *Id.* at 65 (quoting *Exch. Nat'l Bank v. Touche Ross & Co*., 544 F.2d 1126, 1138 (2d Cir. 1976)).

Further, "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Reves*, 494 U.S. at 66.

The promissory note at issue in this case (the MCA Agreement) does not have a duration of less than 9 months; rather, as noted above, the obligation is payable over a span of 70 weeks. *See, supra,* § V(a). So the loan is expressly outside the protective ambit of the codified exclusion to promissory notes being deemed securities. *See* 15 U.S.C. § 78c(a)(10). And while *Reves* does create an exception for "short-term notes secured by an assignment of accounts receivable," *Reves*, 494 U.S. at 65, a normative construction of the words "short-term" is contemplative of a duration well less than 70 weeks (especially in the context of a statute that already draws a line in the proverbial sand at nine months). Case law, unsurprisingly, suggests "short term" to have a meaning far more abbreviated than nine months. *See SEC v. J.T. Wallenbrock & Assocs*., 313 F.3d 532, 535 (9th Cir. 2002) (discussing exception in context of notes payable in 80 to 90 days and, even then, finding notes to be securities); *Allied Prods. Corp. v. Elec. & Gas Tech*., 1998 U.S. Dist. LEXIS 4923, at *6 (N.D. Ill. Apr. 7, 1998) (discussing notes payable in 90 days).

Moreover, the Motion somewhat inverts the analysis elsewhere, suggesting it must be Marque that made an "investment of money." Motion, ECF No. 20, at § II(a)(i)(a). Yet such is a backward reading of the Counterclaim: Rule 10b-5 prohibits fraud or deceit "in connection with the purchase or sale of any security." *Lorenzo v. SEC*, 587 U.S. 71, 74 (2019) (quoting 17 CFR §240.10b-5). It is Kapitus that invested money in purchasing a security from Marque. And it is Kapitus that made misrepresentations—of commission and omission—in connection with that

purchase, for which Kapitus used its own form of agreement, *see* Counterclaim, ECF No. 15, at ¶ 27. While Marque may have been the putative seller of the security, it is Kapitus that drafted the representations contained therein, it is Kapitus that drafted the terms thereof, and it is Kapitus that acted with such "cupidity," *Van Dyke*, 17 S.E.2d at 369, as to cross the threshold into fraudulent conduct.

The same holds true for the discussion of an "expectation of profits." *See* Motion, ECF No. 20, at § II(a)(i)(c). It is Kapitus—not Marque—that had the "expectation of profits." After all, it is Kapitus that underwrote a loan bearing interest at the undisclosed rate of 385.88% per annum.

This is critical because, as discussed above, a note *is* "likely" a security "[i]f the seller's purpose is to raise money for the general use of a business enterprise" *Reves*, 494 U.S. at 66. Here, the inferences readily drawable from the Counterclaim are such that Marque borrowed monies from Kapitus "to raise money for the general use of a business enterprise." And it was the fraud of Kapitus—not Marque—in drafting the correlative security (*i.e.*, the loan agreement disguised as a sales agreement) that ran afoul of Rule 10b-5.

**c. Scienter is Properly Alleged**

The final contention of Kapitus, in the Motion, is that the Counterclaim does not properly allege scienter. A plain reading of the pleading and applicable case law, however, firmly evidences otherwise. The Counterclaim very specifically alleges scienter and explains the malfeasant motivations underlying such scienter. This is more than sufficient to survive a motion to dismiss.

At the outset: "Scienter" is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 and n. 12 (1976)).

The Fourth Circuit has noted that "[t]he Private Securities Litigation Reform Act of 1995 . . . imposes a heightened pleading standard for scienter, requiring plaintiffs to 'state with particularity facts giving rise to a *strong inference*' of scienter." *LifeWise Fam. Fin. Sec. v. Holden (In re Triangle Cap. Corp. Sec. Litig.)*, 988 F.3d 743, 751 (4th Cir. 2021) (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis in *Triangle*). "A scienter inference is 'strong' if, when 'weighed against the opposing inferences that may be drawn from the facts in their entirety,' it 'is at least as compelling as any opposing innocent inference." *Triangle*, 988 F.3d at 751 (quoting *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014)).

The Supreme Court has explained the mechanics of how one shows scienter—and how a Rule 12(b)(6) motion (such as that *sub judice*) is to be assessed—under governing securities laws:

> The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible"--it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs*, 551 U.S. at 323-24 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004) (quoting *Helwig v. Vencor, Inc*., 251 F.3d 540, 553 (CA6 2001))).

Here, the Counterclaim identifies both an objective falsity (a clause insisting the document to be a sale and not a loan) as well as a material omission (a delineation of the applicable interest rate for the loan being made). More importantly, though, the Counterclaim also explains *why* Kapitus is motivated to engage in fraud of both commission and omission: acknowledging the form document to be a loan agreement would subject Kapitus to peril in states with a commercial

usury rate, imprinting an interest rate would deter merchants from entering into such perilous agreements, and disclosing an interest rate would deter guarantors (often the principals of the at-issue merchants) from executing their guarantees.

The allegations of the Counterclaim—reviewed "holistically," *Triangle*, 988 F.3d at 751—explain why Kapitus is concealing material information about the loan and why Kapitus is engaging the outright falsity of insisting the MCA Agreement is not a loan agreement. It would be very bad for Kapitus to imprint a 385.88% interest rate on a loan agreement; not only would Marque and Mr. Lukes demur to such an agreement but state regulators and aggrieved borrowers would no doubt seize upon such a rate in those corners of the United States where commercial usury is more tightly regulated.

In the Motion, Kapitus insists this is nonsensical because the MCA Agreement contains a boilerplate clause governing what happens if the document is recharacterized as a loan. *See* Motion, ECF No. 20, at § III(a). Much to the contrary, however, this boilerplate language actually exemplifies the scienter of Kapitus: the entity is so acutely aware that its form agreement is prone to be deemed a loan, if viewed by a court, that Kapitus is preemptively trying to minimize the potential economic damages the entity may suffer in such an eventuality. This is not a good faith provision aimed at buttressing the uncertainty of future events; this is the equivalent of peddling promissory notes issued by a Ponzi scheme and including fine print, thereupon, providing that "should it be determined the maker of this note is engaged in a massive criminal enterprise, and that there is not actually a good faith basis to promise the holder of this note a monthly return of 20% on their investment, the terms of this note shall reset to whatever is legal so as to aid the maker in avoiding too stiff of a prison sentence while also minimizing their civil liability."

The malefaction of the putative savings clause can be scantly understated. While the foregoing Ponzi exemplar may seem absurd, the reality is the verbiage is not far off the mark *sub judice*: Kapitus is being called to task for trafficking in disguised loans and responding by pointing to fine print that shows Kapitus is all-too-aware it may be called to task for trafficking in disguised loans. This is not exculpating; this is evidence of scienter.

## VI. Conclusion

WHEREFORE, the Counter-Plaintiffs respectfully pray this Honorable Court (i) deny the Motion; and (ii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: September 28, 2026

By: /s/ Maurice B. VerStandig

Maurice B. VerStandig, Esq.
Virginia Bar No. 81556
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Counsel for Marque Dental Laboratory, LLC and Michael Lukes*

*[Certifications on Following Page]*

**CERTIFICATION CONCERNING ARTIFICIAL INTELLIGENCE**

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of September, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification to the CM/ECF users noted below:

Laura Maughan, Esq.
Andrew Biondi, Esq.
Sands Anderson, PC
919 E. Main Street, Suite 2300
PO Box 1998
Richmond, VA 23218
lmaughan@sandsanderson.com
abiondi@sandsanderson.com
*Counsel for the Plaintiff*

/s/ Maurice B. VerStandig
Maurice B. VerStandig