UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| **KAPITUS SERVICING, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:26-cv-315** |
| | ) | |
| **MARQUE DENTAL LABORATORY, LLC, and MICHAEL LUKES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS COUNTERCLAIM

Marque's Response in Opposition opens in a bombastic, melodramatic – and at times, wholly inappropriate – style, which it carries throughout its Response. It begins with uncalled for accusations of "loan sharking," conjures up the calls of sirens, and then accuses Kapitus of duplicitous behavior, having a dearth of dignity and integrity, and being nothing more than a "ruthless con." Resp. at 2. The over-the-top rhetoric does not stop there, however. It goes on to reference a 1960s musical about a traveling con artist and draws to a close by accusing Kapitus of "peddling promissory notes issued by a Ponzi scheme" in furtherance of a "massive criminal enterprise" and ends by implying that Kapitus should be imprisoned based on its business model. *Id.* at 2, 15. All because Marque refuses to pay Kapitus the $180,000 it owes.

Not only is this rhetoric uncalled for, it serves only to highlight the weaknesses in Marque's position on its counterclaim. It evokes the well-known legal adage that goes, "If you have the facts on your side, pound the facts; if you have the law on your side, pound the law; if you have neither, pound the table." Marque's Response is nothing more than the sound and fury of its table-pounding.

## Introduction

Marque's theory, distilled to it essence, is this: the Agreement is a loan. Loans are securities. And because Kapitus and Marque both agreed that the Agreement was a sale of receivables, Kapitus has committed securities fraud. But Marque itself concedes that "it appears no court has, to-date, been tasked with assessing whether or not the frauds innate in an MCA transaction run contra to Rule 10b-5." Resp. at 2–3. There is a reason for that: the theory has no basis in law.

Marque's Response does nothing to cure the fatal deficiencies Kapitus identified in its opening brief. First, the Agreement is not a loan. Second, even if it were, Virginia law bars Marque from doing exactly what it is implicitly urging this Court to do by virtue of its repeated appeals to usury laws in other states: avoid payment by invoking unsound usury or interest-rate theories. Third, the Agreement is not a security and Marque's inverted "Kapitus was the investor" theory fundamentally misapplies both the Securities and Exchange Act ("the Act") and the facts of the specific transaction at issue. Fourth, and finally, despite accusations of a Ponzi scheme and fantastic implications of criminal intent conjured from a total re-write of the Agreement (Resp. at 15), there are simply no factual allegations of scienter alleged in the Counterclaim. The Counterclaim should be dismissed.

## Argument

### I. Virginia Law Forecloses What Marque is Trying to Do

Before getting to the loan-versus-sale debate, the Court should recognize what Marque is attempting to do, and why Virginia law categorically forbids it.

Marque concedes this point outright when it writes: "Virginia does not have a commercial usury restriction other than that applicable through the law governing unconscionability. *See* Va. Code § 6.2-308." Resp. at 6. The Agreement requires that all disputes be litigated in Virginia courts

or in the Eastern District of Virginia and dictates that the Agreement is to be governed by and construed in accordance with Virginia law. Dkt. No. 1-2, p. 17, Agreement § 4.5.

Virginia Code § 6.2-317 provides:

> No person shall, by way of defense or otherwise, avail himself of the provisions of this chapter, or any other statutory or case law relating to usury or compounding of interest, to avoid or defeat the payment of interest, ***or any other sum***, in connection with a loan made to a person for business or investment purposes, if the initial amount of the loan is $5,000 or more.

Kapitus raised this statute in its opening brief. Mem. Supp. 6 n.3. Marque ignores it entirely. That silence speaks volumes.

Marque desperately wants the Agreement to be a loan, yet it overlooks the very statute that bars any defense premised on usury or interest rates when a "loan" is for business purposes and exceeds $5,000. The Agreement plainly satisfies both prerequisites. Section 2.13 of the Agreement provides: "Seller is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes." Dkt. No. 1-2, p. 15, Agreement § 2.13; *see also* Use of Proceeds Certification, Dkt. 1-2 at 19. And the Purchase Price of $130,000 far exceeds $5,000.

A substantial portion of Marque's Opposition leans heavily on out-of-state usury laws and recharacterization arguments to support treating the Agreement as a usurious loan. *See, e.g.,* Resp. at 6 (citing *In re Williams Land Clearing, Grading, & Timber Logging, LLC*, 2025 WL 1426503, at *9 (Bankr. E.D.N.C. May 16, 2025) (applying New York law and holding "[p]ursuant to applicable New York statutory and case law, the MCA Agreement is criminally usurious"); *In re Denali Constr. Servs.*, 2026 WL 800949 (Bankr. N.D. Tex. Mar. 20, 2026) (applying Texas law);

*Van Dyke v. Commonwealth*, 17 S.E.2d 366, 369 (Va. 1941); and *Chakales v. Djiovanides*, 170 S.E. 848, 862 (Va. 1933)).[1]

But that is *exactly* what Va. Code § 6.2-317 says Marque categorically *cannot* do. Marque is using usury case law to repackage a barred usury defense as a federal securities claim in order to "avoid or defeat the payment of interest, ***or any other sum***," owed under the Agreement. The statute was enacted to prevent precisely this kind of end-run. And Kapitus cited a persuasive Virginia circuit court opinion interpreting this very statute and analyzing this very principle to these very same types of agreements. *See, e.g., Kapitus Servicing, Inc. v. Lena LA d/b/a T.J. Nails*, No. CL21-1205 (Va. Henrico Cir. Feb. 14, 2022) ( "Even if the Agreement were a loan, the Defendant may not use usury as a defense as the loan would have been solely for business purposes and was over $5000 as contemplated in Virginia Code §6.2-317.").

And again Marque's inflated and unsupported assertion that this Agreement contains an interest rate of 385.88% is premised entirely on multiple misleading characterizations of the Agreement's terms. First, Marque ignores the fact that it received the benefit of a $97,383.00 credit as part of the Agreement and instead insists that it received a benefit of only $28,392. Resp. at 4. Second, Marque's calculation of an interest rate imposes a fixed period of time for payment of the purchased receivables, which is simply not in the Agreement. Indeed, the Agreement explicitly states "The Purchase Agreement shall have an indefinite term." Dkt. No. 1-2, p. 12, Agreement § 1.2. Third, the Agreement expressly states that the "Parties agree and acknowledge that there is

[1] Notably, both Virginia cases Marque cites – *Van Dyke v. Commonwealth*, 17 S.E.2d 366, 369 (Va. 1941) and *Chakales v. Dijovanides*, 170 S.E. 848, 862 (Va. 1933) are Virginia cases interpreting the state of Virginia's usury laws in 1941 and 1933, respectively. The Agreement in this case was executed in 2024. The relevant provision of Va. Code § 6.2-317 has been substantively in effect since 1987.

no stated or unstated interest factor in this Agreement, and no interest will be paid." Dkt. No. 1-2, p. 12, Agreement § 1.1(c).

Marque may not – by statute – "avail [itself] of the provisions of" Virginia's usury laws "or any other statutory or case law relating to usury or compounding of interest" to avoid paying Kapitus. The "interest rate" argument and all the implications that Marque wants to attach to it are quite simply dead on arrival.

## II. Even Under Marque's own Test, the Agreement is not a Loan

Marque invites the Court to apply the three-factor test from *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023): "'(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.'" Resp. at 8 (additional citations omitted). Before beginning the analysis, it is important to note two limiting factors here. First, this is a Second Circuit case applying New York law. New York has criminal usury statutes that could have been implicated in *Fleetwood* (depending on the facts of that case). Virginia does not. Second, this opinion applies New York law. The Agreement at issue in this case is governed by Virginia law. Virginia's law expressly states that its usury statutes do not apply to an agreement like the one at issue here, so really, Marque's analysis of this case and its holdings is completely inapposite. Nevertheless, Kapitus addresses the arguments.

### *i. This Agreement has a Reconciliation Provision*

Section 8 of the Agreement provides, in relevant part:

> The Specified Amount shall be reconciled to reflect the Seller's actual Receipts at Seller's request. . . . The Specified Amount is an estimate of the Specified Percentage. . . . [Seller provides bank data] to reconcile the ACH debits to the Specified Percentage permitting Servicer to debit or credit the difference to the Seller. . . . Upon verification of the Receipts generated by Seller, Servicer shall adjust the Specified Amount on a going-forward basis to more closely reflect the

> Seller's actual Receipts. . . . Once the Seller elects to conduct a reconciliation, either Party may thereafter request a reconciliation once every 30 days.

Dkt. No. 102, p. 9, ¶ 8.) The Specified Percentage is 16.4%. *Id.* at p. 8, ¶ 7.

The Agreement plainly does have a reconciliation provision. The provision is not "illusory" (Resp. at 8) simply because Marque never bothered to exercise its rights to reconcile. The Counterclaim nowhere alleges that Marque ever requested a reconciliation or that any such request was refused. Instead, Marque's Response complains about a hypothetical situation in which winter snowstorms shut down North Dakota and Marque could only request reconciliation every 30 days. This does not make the clause itself illusory. Nor can Marque now – in its Response brief – allege new facts attempting to show that it was. This argument has no merit for the reasons that follow.

First, the 30-day cadence applies only *after* a seller first elects a reconciliation (which Marque never did), and the true-up mechanism then allows Kapitus to "debit or credit the difference." Dkt. No. 1-2, p. 9, Agreement ¶ 8. So Marque's colorful snowdrift hypothetical (Resp. at 8–9) is answered by the credit mechanism that is already built into the Agreement.

Even better: Marque's snowdrift hypothetical is expressly addressed, too. The Agreement carves out interruptions "as a result of adverse weather, natural disasters or acts of God" from the Events of Default. Dkt. No. 1-2, p. 15, Agreement § 3.1(c). Kapitus drafted the Agreement to account for exactly the North Dakota winter risk Marque complains about: if adverse weather events interrupt the operation of the business, then Marque would not be in default if it failed to comply during this period.[2] The default carve-out ("SELLER SHALL NOT BE ENTITLED TO

---

[2] Because this is nothing more than a hypothetical situation raised in the body of a Response brief, it hardly bears mentioning that seasonal fluctuations in the business of a dental laboratory located in a city and state well-accustomed to snow accumulations is suspect to begin with. It is not like unexpected snowfall killed off a crop of fruit trees Marque was intending to sell or a storm destroyed its entire inventory. Nevertheless, had such an incident occurred, the Agreement provides for relief and precludes default.

ANY RECONCILIATION IF SELLER HAS DEFAULTED UNDER ANY OF THE TRANSACTION DOCUMENTS") simply means a merchant cannot breach the Agreement and *then* demand a discount. But this does not make reconciliation "unavailable in practice." *See Spig Indus., LLC v. Novac Equities LLC*, 2025 U.S. Dist. LEXIS 208356, at *42 (S.D.N.Y. Oct. 22, 2025) (Marque's own cite). Indeed, the Agreement at issue here *requires* Kapitus to reconcile the Specified Amount. *See* Dkt. No. 1-2, p. 9, Agreement ¶ 8 ("Upon verification of the Receipts generated by [Marque], [Kapitus] ***shall*** adjust the Specified Amount on a going-forward basis to more closely reflect the Seller's actual receipts.") (emphasis added). This is not an illusory contractual clause; this mandatory language binds Kapitus to its promise to reconcile the Specified Amount upon verification of Marque's actual receipts.

New York law supports Kapitus on this point. In *American Water Restoration, Inc. v. AKF Inc.*, 2022 WL 176400, at *3-4 (Sup. Ct. Jan. 7, 2022), a New York court found that the existence of a mandatory reconciliation clause – one with the word "shall" – "negates Plaintiffs' usurious loan contention." And that reconciliation clause – much like the one in the instant Agreement – also limited reconciliation to "once each calendar month" and was available "[f]or as long as no Event of Default has occurred." *Id.* at *4. This clause "undeniably refute[d]" the criminal usury loan allegations in that case. *Id*. at *5. Another New York court made a similar decision and granted a motion to dismiss a cause of action seeking a declaratory judgment that an agreement was a usurious loan, in part because the agreement contained a reconciliation provision. *See Tender Loving Care Homes Inc. v. Reliable Fast Cash, LLC*, 172 N.Y.S. 3d 335, 340 (Sup. Ct. June 22, 2022). In fact, the Southern District of New York has addressed this issue as well, finding that an agreement containing a mandatory reconciliation provision was not a loan, "particularly where Plaintiffs have not alleged that reconciliation did not in actuality function as agreed (or, indeed,

that Plaintiff ever even requested reconciliation)." *Streamlined Consultants, Inc. v. EBF Holdings LLC*, Case No. 21-CV-9528, 2022 WL 4368114, at *4 (S.D.N.Y. Sept. 20, 2022). And finally, in *Pirs Capital, LLC v. D&M Truck, Tire & Trailer Repair Inc.*, 129 N.Y.S. 3d 734, 740 (Aug. 17, 2020), a New York court found at summary judgment that the agreement at issue was not a loan in part because it contained a reconciliation provision. In that case – as in this one – the defendants asserted that the provision was "simply a sham to hide a usurious loan." *Id*. The only support for this, however, was the "affirmation of counsel" that no reconciliation had occurred. *Id.* Missing from that case – much like this one – was any allegation, affirmation, or otherwise, that the defendant ever even requested an adjustment of the amount to be paid. *Id.* Even under the jurisprudence of a jurisdiction evaluating its own criminal usury laws, New York courts have repeatedly found that the existence of a mandatory reconciliation provision counsels in favor of finding that an agreement is *not* a loan. If this Court were to adopt the out-of-state test Marque proposes (and it should not), the Agreement in this case is plainly not a loan.

Marque made $35,997.25 in payments to Kapitus. Compl. ¶ 11. "Between August 26, 2024 and February 28, 2025, a number of payments did not clear."[3] Compl. ¶ 12. The Agreement expressly allowed Marques to request reconciliation. It never did. The fact that it did not make that request does not make the mandatory reconciliation provision illusory. This first factor weighs in favor of finding that the Agreement is not a loan under New York law.

*ii. The Agreement has no Finite Term*

Section 1.2 of the Agreement states:

> The Purchase Agreement shall have an indefinite term. The Purchase Agreement shall commence with Purchaser's delivery of the funds constituting the Purchase

[3] In North Dakota, for all of August and most of September, it is still summer, making snow drifts an unlikely cause for Marque's missed payments during this time.

> Price and shall run until such time as Purchaser receives sufficient receipts to equal the value of the Purchased Amount.

Dkt. No. 1-2, p. 12, Agreement § 1.2. Marque offers up a "70-week" term by dividing $178,100 by $2,571. Resp. at 10. That arithmetic assumes away reconciliation entirely by virtue of the circular reasoning that defeats its own premise. There is no maturity date, no amortization schedule, and no stated interest rate. The Agreement's duration is entirely contingent on Marque's business performance.

The *Fleetwood* case upon which Marque relies does not address this second factor. *Fleetwood*, 2023 WL 3882697, at *2. And *In re Williams Land Clearing, Grading, and Timber Logger, LLC*, 2025 WL 1426503, at *6 (E.D.N.C. May 16, 2025) – a case cited by Marque – holds that "[w]ithout additional context including course of dealing, however, the court finds that neither of these factors [reconciliation and finite term] is dispositive of the characterization as either a sale or a loan." Here, the Court has no "additional context" to speak of. Marque has not alleged that it attempted reconciliation and was denied. Marque has not alleged anything other than its own mathematical calculations – which are contrary to the plain and unambiguous terms of the Agreement – to attempt to establish that the Agreement actually does contain a finite term for repayment.[4] Thus, according to one of Marque's own cases, these factors are not dispositive.

*iii. The Agreement Does Not Contain Recourse Should Marque Declare Bankruptcy*

Marque first acknowledged the obvious, as it must: it is not in bankruptcy. Resp. at 10. After doing so, however, Marque likens the filing of a simple breach of contract claim (as is the

[4] Under Marque's theory, *any* agreement to pay a sum of money on some schedule of daily, weekly, monthly, or yearly payments – even if a party can change the amounts due as needed – would necessarily be an agreement with a finite term. This is not the meaning of the word "finite." It is also not the ordinarily understood meaning of the phrase "finite term" in the context of commercial agreements governing the payment of sums of money.

case here) as "comparable" to a bankruptcy simply because Marque has ceased operations. *Id.* But those two things are not the same. And simply because Kapitus has filed suit on its breach of contact claim does not mean that the Agreement itself contains recourse, should Marque actually, at some point in the future, file for bankruptcy. But this mixes both the legal and factual worlds at play here: Marque is a business that has not filed for bankruptcy. Mr. Lukes is an individual who has also not filed for bankruptcy. There are two different players and two different procedural postures. In its Response, Marque does not identify any part of the Agreement that provides recourse for Kapitus *in bankruptcy*. Instead, it once again attempts to re-write the language of the Agreement and re-define words to align with an interpretation of the law and the facts that salutes the false flag it has planted. Marque argues that the Agreement "makes it a breach to go out of business without Kapitus' consent." Resp. at 10, citing § 3.1(c) of the Agreement. But the Agreement does not say this. The Agreement defines an event of default to occur when: "Seller interrupts the operation of its business in the ordinary course (other than as a result of adverse weather, natural disasters or acts of God) without notice to [Kapitus] of any planned shutdown or interruption of operations." Dkt. No. 1-2, Agreement § 3.1(c). "Going out of business" or "interrupt[ing] operations" is not the same as filing for bankruptcy. And even still, if Marque had simply notified Kapitus in advance of its intent to "interrupt[] the operation of its business," then default under this provision would not even be at issue. This is yet another instance in which Marque desperately wants the Agreement to say things the Agreement simply does not say. The language in the Agreement is not ambiguous. Marque makes no argument that it is. And when the language in a contract is "plain and unambiguous on its face, the Court will not look for meaning beyond the instrument itself." *Robinson-Huntley v. George Washington Carver Mut. Homes Ass'n*, 287 Va. 425, 429 (2014). More recently, the Court of Appeals of Virginia again stated that when

a contract is unambiguous (meaning, "its provisions are capable of only one reasonable construction"), then "'the'[w]ords that the parties used . . . are normally given their usual, ordinary, and popular meaning.'" *LPC Commercial Servs, LLC v. Ar-Razzaaq Properties, LLC*, 933 S.E.2d 894, 901-02 (2026) (alterations in original; additional quotations omitted). When this is the case, then "the court is not at liberty to search for its meaning beyond the instrument itself" and the Court "should look no further than the four corners of the instrument under review." *Virginia Elec. and Power Co. v. Northern Virginia Regional Park Authority*, 618 S.E.2d 323, 326 (2005).

Here, Marque urges the Court to find that the Agreement on its face contains recourse in the event Marque should file for bankruptcy. But the Agreement does not contain such terms and Marque has not filed for bankruptcy. Marque's best and only argument here is to take a provision that has nothing to do with bankruptcy and attempt to make it mean something that it does not. This is improper.

Even under the non-applicable, out-of-state, out-of-circuit framework Marque urges this Court to adopt, the Agreement patently fails the test Marque demands that it take. The Agreement is simply not a loan.

## III. The Agreement is Not a Security and Kapitus is Not an "Investor"

In an interesting twist, Marque insists that it was not Marque who played the role of the duped investor for purposes of a Securities and Exchange Act 10b-5 fraud claim.[5] Instead, it now insists that "[i]t is Kapitus that invested money in purchasing a security from Marque." Resp. at 12. But the primary purpose of the Securities Exchange Act of 1934 is to ***protect investors***. *See,*

[5] Kapitus relies on and stands behind its initial arguments made in its Memorandum in Support of its Motion to Dismiss, which addressed the *Reves* and *Howey* tests. By addressing Marque's novel application of the Securities Exchange Act, it does not intend to waive its prior arguments outlined in its opening Memorandum.

*e.g., In re Concho Resources, Inc. Securities Litigation*, 2025 WL 289915, at *3 (S.D. Tex. Oct. 10, 2025) (recognizing that "a central purpose of these securities laws is to protect investors and would-be investors in the securities market against misrepresentations")(internal citations omitted). The Supreme Court wrote in *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) that one of the "central purposes" of the Act "is to protect investors through the requirement of full disclosure by issuers of securities." In *Ernst & Ernst v. Hochfelder* 425 U.S. 185, 195 (1976), the United States Supreme Court again held that the "1934 Act was intended principally to protect investors against manipulation of stock prices through regulation . . ."

If we accept Marque's about-face that it was actually *Kapitus* that was the investor (not Marque) then we must also accept that Marque was the issuer of a security. And if that is the position that Marque is now taking, then it has even more plainly failed to state a claim upon which relief can be granted. It has alleged absolutely no facts tending to show how Kapitus's purported "investment" in Marque was an "investment" or a purchase of a security at all. Even case law from within the Second Circuit – the Circuit upon which Marque primarily relies – has written that the "purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions – to make sure that ***buyers*** of ***securities*** get what they think they are getting and that ***sellers*** of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be." *United States v. Rosenthal*, 1992 WL 84468, at *2 (S.D.N.Y. April 14, 1992) (emphasis added).

If Marque is to be believed, and if Kapitus is the "investor" in this transaction (which must be the sale or purchase of a security), then Marque needed to plead facts showing that the receivables Kapitus purchased from Marque were also "securities" for purposes of the Act. It has

plainly not done so because, it repeatedly insists, the Agreement was not a sale at all.[6] This is just one place where Marque's novel theory falls apart: it cannot – at the same time – insist that the Agreement was a loan and not a sale, and then attempt to hold Kapitus liable for violating the Securities Exchange Act, which necessarily *requires* a transaction involving the sale or purchase of a security.[7]

Taking this novel theory a step further, and accepting Marque's invitation that "Marque may have been the putative seller of the security" (Resp. at 13), then one would begin to wonder whether it was Marque – not Kapitus – that made material misrepresentations in the "sale" of a security when it told Kapitus on June 20, 2024 that:

- "[n]o material changes, financial or otherwise, in the condition, operation, or ownership of [Marque] and [Mr. Lukes] . . . are in any way expected or anticipated" (Dkt. No. 1-2, p. 14, Agreement § 2.1) and that,
- "[Marque] and [Mr. Lukes] do not anticipate closing or selling Seller's business" (*id.*) and that,
- "[Marque] is solvent," (*id.* at §2.9) and that

[6] As a reminder, Marque wrote that the Agreement was a "ruthless con of simply 'purchasing' a business' future flow of revenues" (Resp. at 1-2) and that the Agreement was "a putative present sale of rights to payment that do not yet exist . . . is both a metaphysical and legal impossibility." Resp. at 5.

[7] In the most common and typical example of an investment, a buyer pays money for a small percentage of an ownership interest in a company, with the expectation that said buyer will be paid dividends on that investment which correlate with the size of the buyers' initial investment. A common example is the purchase of stock in a publicly traded company. But that is not what happened here. Kapitus purchased *receivables* – a discrete business asset – not an ownership interest in Marque. But again, according to Marque, there was no purchase at all, and instead, the Agreement was merely a gussied up loan, meaning no ownership interest of any kind in any thing was exchanged. Marque cannot have it both ways.

- "[Marque] shall not: . . . (b) effectuate the suspension, dissolution, or termination of [its] business without express prior written consent of [Kapitus]" (*id.* at p. 15, § 2.15) and that
- "[Marque] has good, complete and marketable title to all Receipts, free and clear of all liabilities, liens, claims, changes, restrictions conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind . . ." (*id.* at § 2.11)

and then a mere two months after executing the Agreement, on August 26, 2024, began failing to make timely payments (Compl. ¶ 12.) and then "ceased conducting business in early 2025." Dkt. No. 3, Marque's Motion to Dismiss, at 2.

This novel theory is nothing more than just that: novel. And a theory. It falls apart in application of the law and the facts and relies entirely on the shifting whims of Marque to serve up what is ultimately nothing more than an aromatic soup sandwich.

## IV. Marque has Still Failed to Allege Scienter

Not only has Marque plainly failed to meet the standards for pleading scienter in a 10b-5 claim, but instead of acknowledging the facts it has alleged, it resorts to puerile tactics like punny name calling and hyperbole when argues that Kapitus was "peddling promissory notes issued by a Ponzi scheme." Resp. at 15. Not satisfied with that alliterative bit, Marque goes on to – yet again – re-imagine the very Agreement it purports to rely on in making its claim under the Act. Instead of actually quoting the "savings clause" in the Agreement, Marque hyperbolizes it, and says that it:

> provid[es] that "should it be determined the maker of this note is engaged in a massive criminal enterprise, and that there is not actually a good faith basis to promise the holder of this note a monthly return of 20% on their investment, the terms of this note shall reset to whatever is legal so as to aid the maker in avoiding too stiff of a prison sentence while also minimizing their civil liability."

Resp. at 15. This language is obviously *not* in the Agreement. But Marque acts as if it is and baldly claims that this non-existent clause is really what the Agreement means when it includes a savings clause because this is Marque wants and needs the Agreement to say to make its claim of fraud. But the law requires more in this case.

The PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 313 (2007). The *Tellabs* Court went on to say that when considering fraud claims in this context, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. Once it has done so, the Court must be satisfied that the plaintiff's "inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Id*.

Once again, Marque refuses to face either the facts or the law, and simply relies on nothing more than a hyperbolic and satirical recasting of the very Agreement it needs to make its case. This is not scienter and this is not a legally or factually sufficient allegation that can survive a motion to dismiss.

**Conclusion**

For the reasons outlined herein, and for the reasons further articulated in its Memorandum in Support of its Motion to Dismiss Marque's Counterclaim, Kapitus respectfully asks this Court to dismiss the Counterclaim in its entirety for failure to state a claim upon which relief can be granted.

Dated: October 5, 2026

Respectfully submitted,

**KAPITUS SERVICING, INC.**

*By Counsel*

/s/

Laura Maughan (VSB #87798)
Andrew Biondi (VSB #48100)
Sands Anderson, PC
919 E. Main Street, Suite 2300 (Zip 23219)
PO Box 1998
Richmond, VA 23218
(804) 648-1636 (Main)
lmaughan@sandsanderson.com
abiondi@sandsanderson.com

**Use of Artificial Intelligence**

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting *pro se*) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

/s/
Laura Maughan (VSB #87798)
Sands Anderson PC

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of October 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification to the CM/ECF users noted below:

Maurice B. VerStandig, Esq.
Virginia Bar No. 81556
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Counsel for Marque Dental Laboratory, LLC and Michael Lukes*

/s/
Laura Maughan (VSB #87798)
Sands Anderson PC